**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John G. GELLENE, Defendant–
Appellant.**

**No. 98–2985.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1998.

Decided July 20, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 17, 1999.*

---

* The Honorable Joel M. Flaum did not participate in the consideration of the suggestion for rehearing en banc.

Steven M. Biskupic (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Mark L. Rotert (argued), Jeffrey E. Crane, Winston & Strawn, Chicago, IL, for Defendant–Appellant.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

John G. Gellene, a partner at the law firm of Milbank Tweed Hadley & McCloy ("Milbank") in New York, represented the Bucyrus–Erie Company ("Bucyrus") in its Chapter 11 bankruptcy. Mr. Gellene filed in the bankruptcy court a sworn declaration that was to include all of his firm's connections to the debtor, creditors, and any other parties in interest. The declaration failed to list the senior secured creditor and related parties. Mr. Gellene was charged with two counts of knowingly and fraudulently making a false material declaration in the Bucyrus bankruptcy case, in violation of 18 U.S.C. § 152, and one count of using a document while under oath, knowing that it contained a false material declaration, in violation of 18 U.S.C. § 1623. Although Mr. Gellene admitted that he had used bad judgment in concluding that the representations did not need to be disclosed, he asserted that he had no fraudulent intent. After a six-day trial, on March 3, 1998, the jury returned guilty verdicts against Mr. Gellene on all three counts. Mr. Gellene was sentenced to 15 months of imprisonment on each count, to run concurrently, and was fined $15,000.

## I

## BACKGROUND

### A. The Bucyrus Bankruptcy Proceedings

Bucyrus, a manufacturer of mining equipment based in South Milwaukee, Wisconsin, had retained Milbank to represent it in general corporate matters in the

1980s. Between 1988 and 1992, Bucyrus' financial transactions, including a leveraged buy-out, left the company with more than $200 million in debt. During that time, the head of Milbank's Mergers and Acquisitions Department, Lawrence Lederman, managed the Bucyrus account. In 1993, Lederman brought in Mr. Gellene, a bankruptcy attorney at Milbank, to work on the financial restructuring of Bucyrus.

At that time, the major parties with an interest in Bucyrus included Goldman Sachs & Co., Bucyrus' largest equity shareholder, which held 49% of the Bucyrus stock; Jackson National Life Insurance Company ("JNL"), Bucyrus' largest creditor, which held approximately $60 million in unsecured notes; and South Street Funds, a group of investment entities, which held approximately $35 million in senior secured notes and leasehold interests.[1] South Street Funds was managed and directed by Greycliff Partners, an investment entity which consisted of financial advisers Mikael Salovaara and Alfred Eckert, former employees of Goldman Sachs.

On February 18, 1994, Bucyrus filed its Chapter 11 bankruptcy petition in the Eastern District of Wisconsin.[2] Because the legal representation of a debtor is subject to court approval, Bucyrus submitted an application requesting that Milbank be appointed to represent it in the bankruptcy. Pursuant to Bankruptcy Rule 2014, the application included the required sworn declaration disclosing "any connection" that Milbank had with "the Debtors, their creditors, or any other party in interest." [3] Ex. 22, ¶ 5. Mr. Gellene, Milbank's lead attorney in the Bucyrus bankruptcy, under oath disclosed that his firm had previously represented Goldman Sachs and JNL in "unrelated" matters and would continue to represent Goldman Sachs in non-Bucyrus proceedings. *See id.* at ¶ 6. Mr. Gellene did not disclose any of Milbank's representations of South Street, Greycliff Partners or Salovaara.

The United States Trustee and JNL filed objections to Mr. Gellene's Rule 2014 declaration. They sought additional information regarding Milbank's representation of Goldman Sachs and questioned whether there was a sufficient conflict of interest to bar Milbank's retention as counsel for the debtor.

On March 23, 1994, the bankruptcy court conducted a hearing on the issue. It requested that Mr. Gellene submit a second declaration containing more detail

---

1. According to Assistant United States Trustee John Byrnes, South Street Funds purchased Bucyrus' manufacturing equipment pursuant to a leaseback arrangement in order to raise money prior to the bankruptcy. Therefore, South Street is a creditor that held the debtor's equipment along with other secured debts.

2. Filing bankruptcy along with Bucyrus was a related corporate entity called B–E Holdings, Inc.

3. Rule 2014, "Employment of Professional Persons," states:

 (a) Application for an order of employment
 An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals ... shall be made only on application of the trustee or committee. The application shall be filed and ... a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, *all of the person's connections with the debtor, creditors, any other party in interest,* their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a *verified statement* of the person to be employed *setting forth the person's connections with the debtor, creditors, or any other party in interest,* their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.
 Fed. R. Bankr.P.2014 (emphasis added).

about possible conflicts of interest.[4] The court specifically commented: "If you represent them [Goldman Sachs] in other matters, then I think it's important to state precisely what arrangements have been made internally to separate what you're doing in this matter with the recommendation in other matters." Tr. 917–18.

On March 28, 1994, Mr. Gellene signed a second sworn Rule 2014 statement providing details about Milbank's representation of Goldman Sachs and the "Chinese wall" that the firm planned to put in place. It also disclosed its prior representation of two other creditors, Cowen & Co. and Mitsubishi International. The declaration then stated:

> Besides the representations disclosed in my declaration dated February 18, 1994, after due inquiry I am unaware of any other current representation by Milbank of an equity security holder or institutional creditor of [Bucyrus].

Ex. 27, ¶ 7. Mr. Gellene again did not disclose any representation by Milbank of South Street, Greycliff Partners or Salovaara. However, at the time of both declarations, Milbank was doing their legal work, including the representation of Salovaara when his partner, Alfred Eckert, sued him.[5]

At Milbank, one partner recognized that there might be a conflict of interest between Milbank's representation of Salovaara in the Salovaara–Eckert dispute and its representation of Bucyrus in its bankruptcy proceedings. At a meeting on December 22, 1993, with Mr. Gellene, Lederman and Milbank partner Toni Lichstein, all of whom were working on the Bucyrus bankruptcy and the Salovaara–Eckert dispute, Lichstein raised the possibility of conflict. Both Lederman and Mr. Gellene stated it was not a problem. Lichstein raised the issue again in March 1994 after she, representing Salovaara, had attended a South Street investors' meeting at which South Street's investment in Bucyrus was discussed. At that time, Mr. Gellene responded that Salovaara was not a creditor of Bucyrus and that all disclosure obligations had been satisfied. However, Lederman suggested that, if Lichstein had further concerns, Salovaara should obtain other counsel. After that, Milbank's representation of Salovaara in his dispute with Eckert slowed and eventually ended. By December 1994, Lederman had resigned his representation of South Street/Greycliff and had written off the billings generated in a tangential matter, a Colorado bankruptcy[6] (about $16,000), and in the Salovaara–Eckert dispute (more than $300,000). Mr. Gellene also wrote off $13,000 in fees and expenses on the Bucyrus bankruptcy billings.[7] Mr. Gellene never

---

4. The bankruptcy court also told Mr. Gellene: "New York is different from Milwaukee.... Professional things like conflicts [of interest] are taken very, very seriously. And for better or worse you're stuck in Wisconsin." Tr. 916.

5. In November 1993, after Salovaara's partner Alfred Eckert decided to pursue employment elsewhere, Salovaara threatened and ultimately took legal action against him. Milbank served as Salovaara's attorney through June of 1994, although a New Jersey firm was listed as the counsel of record in the initial litigation. The dispute between Salovaara and Eckert involved control of South Street and Greycliff; it was still ongoing in 1998. On December 9, 1993, during the Salovaara–Eckert dispute, Mr. Gellene and other Milbank lawyers began representing South Street and Greycliff in an acquisi-

tion of a $15 million note and claim in the Colorado bankruptcy of George Gillett. Mr. Gellene was the Milbank partner in charge of the matter. In fact, Mr. Gellene billed work on this project the same day that he signed his second declaration in the Bucyrus case.

6. An internal Milbank memorandum stated that the matter had been "billed prior to a conflict arising in connection with our representation of Bucyrus–Erie in its bankruptcy." Tr. 500; Ex. 48. Nevertheless, Milbank did continue to represent South Street/ Greycliff in this matter in 1995 and 1996, and Mr. Gellene directly participated in this further work.

7. Mr. Gellene's internal memo explained the write-off:

> These charges represent fees and expenses incurred prior to February 18, 1994,

informed anyone at Bucyrus of the other Milbank representations.

Meanwhile, the Bucyrus bankruptcy creditors' committee worked through the summer and fall of 1994 to see if it could formulate a plan that would satisfy the major creditors.[8] By late fall, a compromise was reached and all the parties to the Bucyrus bankruptcy agreed to the new plan of reorganization.

Thereafter, Milbank filed a petition requesting compensation for its work on the bankruptcy case. In November 1995, a hearing was held on Milbank's application for more than $2 million in legal fees and expenses. The United States Trustee and JNL both opposed the application. Mr. Gellene was lead attorney for Milbank at those hearings. However, when he testified in support of his firm's request for fees, Milbank partner David Gelfand was the attorney who put on Mr. Gellene's testimony. Gelfand presented Mr. Gellene's sworn declarations to him on the stand. Mr. Gellene testified that the supplemental Rule 2014 declaration had disclosed Milbank's relationship with Goldman Sachs and thus that the court had been fully aware of that relationship. However, Mr. Gellene did not testify that his firm had represented and was continuing to represent South Street and Greycliff. The United States Trustee did not learn of that representation until the late fall of 1996. The court ultimately awarded

Milbank approximately $1.8 million in fees and expenses.[9]

In late 1996, JNL discovered that Milbank had represented Salovaara in his dispute with Eckert at the same time it was representing Bucyrus. JNL then filed a motion in the bankruptcy court in December 1996 seeking disgorgement of Milbank's fees. Mr. Gellene did not respond to the motion. On February 24, 1997, when his partners became aware of the motion and asked him about it, Mr. Gellene responded falsely that the answer was due in a few days. Mr. Gellene even altered the JNL filing to conceal the date it had been signed. When that deception was uncovered, however, Mr. Gellene admitted to Lichstein and Gelfand that he had lied about the response due date.

In March 1997, Mr. Gellene filed a third declaration with the bankruptcy court. In it, he explained that he had made an error in legal judgment by omitting Milbank's representations of South Street and of Salovaara and took "full personal responsibility for failing to disclose these matters to the court." Tr. 1247.

## B. The Federal Criminal Charges

On December 9, 1997, a federal grand jury returned a three-count indictment against Mr. Gellene, charging him with two counts of bankruptcy fraud and with one count of perjury. It alleged that Mr. Gellene had lied three times in the course of a bankruptcy case: twice when he filed

---

the date of filing of the chapter 11 petition for Bucyrus–Erie. Under bankruptcy law, retaining these amounts as receivable would cause the firm to be a creditor of Bucyrus–Erie, creating both a potential conflict of interest and potential grounds for disqualification and denial of post-bankruptcy fees. I do not believe the risk is worth taking in view of the amount of the requested write-off, which is less than one-percent of all pre-bankruptcy fees. Tr. 503–04; Ex. 50.

8. On June 20, 1994, the bankruptcy court had rejected the disclosure statement submitted as part of the proposed Bucyrus reorganization on the ground that the statement had failed to

make complete disclosures on some matters, including inadequate disclosure of the roles of Salovaara, South Street and Greycliff in Bucyrus' pre-bankruptcy dealings and failure to explain why certain parties—including Salovaara, South Street and Greycliff—were receiving releases from future litigation. However, the court urged the parties to settle these issues and to agree upon a plan of reorganization by the end of 1994 for tax reasons.

9. Based on Mr. Gellene's false statements, the bankruptcy court subsequently directed Milbank to return the $1.8 million to the bankruptcy estate.

the Rule 2014 declarations knowing that they were false and once when he used the supplemental declaration, while under oath at a bankruptcy hearing, knowing that it contained a false material declaration.

At Mr. Gellene's trial, the government produced evidence of other false representations by the defendant, evidence that was admitted under Rule 404(b) of the Federal Rules of Evidence. The first concerned Mr. Gellene's bar status. He joined the New York State Bar in 1990; however, between 1981 and 1990 he represented himself to be a member of that bar in court filings and in legal publications. Mr. Gellene also represented himself to be a member of the federal bar in the Southern District of New York, both by repeatedly appearing in that court and by claiming that membership when applying for membership in the Eastern District of Wisconsin to represent Bucyrus in its bankruptcy proceedings.

The second category of evidence admitted at trial concerned Milbank's relationship with Lotus Cab Company: Mr. Gellene had included his charges to the cab company in the itemized expenses of the Milbank fee request but had failed to disclose to the court the ownership interest of some law firm partners in that company. The third false representation admitted at Mr. Gellene's trial under Rule 404(b) was made to the Colorado bankruptcy court. After South Street, Milbank's client, failed to produce discovery documents in the bankruptcy case of George Gillett, the bankruptcy court dismissed the South Street claim. Mr. Gellene moved for reconsideration; he stated that the delay in producing the documents was caused by the winding-up of South Street and by the ongoing dispute between Eckert, the managing partner of South Street, and the Funds' portfolio advisor, Greycliff Part-

ners, regarding control of the funds. At Mr. Gellene's trial, however, Eckert testified that Mr. Gellene's explanation was not true and that he had produced the documents shortly after Mr. Gellene had requested them—which was after the deadline for production of the documents.

Mr. Gellene testified as the only defense witness at his trial. He stated that he began work at Milbank in 1980 and developed a bankruptcy practice. He testified that Lederman gave him the Bucyrus work and the South Street/Greycliff representation. He also admitted being aware in December 1993 of his firm's representation of Salovaara in the Eckert dispute. He testified that he failed to disclose these representations in the Bucyrus bankruptcy because he did not consider Salovaara to be a creditor, did not distinguish South Street/Greycliff from Salovaara, and thus did not think the representations needed to be disclosed. He also testified that the matters involving Salovaara, South Street and Greycliff were unrelated to the Bucyrus matter and that an agreement with Salovaara had already been reached. He called these conclusions "bad judgment" and "stupid, but not criminal." The jury did not agree; it convicted him on all three counts.

## II

## DISCUSSION

### A. Bankruptcy Fraud under 18 U.S.C. § 152(3)

#### 1.

Mr. Gellene was found guilty of two counts of making false oaths in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3).[10] He was convicted specifically of "knowingly and fraudulently" making

---

10. § 152. Concealment of assets; false oaths and claims; bribery.

A person who—
. . .
(3) knowingly and fraudulently makes a false declaration, certificate, verification, or

statement under penalty of perjury . . . in relation to any case under title 11; . . . shall be fined under this title, imprisoned not more than 5 years, or both.

false declarations under oath in two Rule 2014 bankruptcy applications.[11] Twice he applied for an order approving his employment as attorney for the debtor; first, on February 18, 1994, the day he filed Bucyrus' Chapter 11 bankruptcy, and second, on March 28, 1994, after the hearing on his application, when he elaborated on potential conflicts of interest, as the bankruptcy court had requested. Those applications failed to list the senior secured creditor and related parties.

■ At trial, the district court instructed the jury on the elements of bankruptcy fraud [12] and specifically instructed that "[a] statement is fraudulent if known to be untrue and made with intent to deceive." Jury Instructions at 18. Mr. Gellene submits that the court's definition of "fraudulent" as "with intent to deceive" is erroneous. In his view, the statute requires that the statement be made not simply with the intent to deceive but with the intent to defraud. He further claims that, because the government misapprehended the statutory requirement, it failed to present evidence that he made his declarations with an intent to defraud because it believed it needed to prove merely an intent to deceive. He submits that the distinction between the two terms is significant: To deceive is to cause to believe the false or to mislead; to defraud is to deprive of some right, interest or property by deceit. Therefore, under § 152 of the Bankruptcy

Code, he contends, the defendant must have a specific intent to alter or to impact the distribution of a debtor's assets and not merely to impact the integrity of the legal system, as the government argued.

We cannot accept Mr. Gellene's narrowly circumscribed definition of "intent to defraud" or "fraudulently." Mr. Gellene would limit exclusively the statute's scope to false statements that deprive the debtor of his property or the bankruptcy estate of its assets. In our view, such a parsimonious interpretation was not intended by Congress.[13]

First, the plain wording of the statute suggests no such limited scope. Rather, the plain wording of the statute punishes making a false statement "knowingly and fraudulently." The common understanding of the term "fraudulently" includes the intent to deceive.[14] Indeed, our case law has long acknowledged a broader scope for the statutory language than Mr. Gellene suggests. We have held that the section is designed to reach statements made "with intent to defraud the bankruptcy court." *United States v. Key*, 859 F.2d 1257, 1260 (7th Cir.1988). In *United States v. Ellis*, 50 F.3d 419 (7th Cir.), *cert. denied*, 516 U.S. 849, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995), we commented that § 152 has long been recognized as the Congress' attempt to criminalize all the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of

**11.** Federal Rule of Bankruptcy Procedure 2014 is presented in full in footnote 3.

**12.** The district court set forth the following elements of a § 152 violation: (1) a bankruptcy proceeding existed under Title 11 of the United States Code; (2) the defendant made a statement relating to the proceedings; (3) the statement was made under penalty of perjury; (4) the statement related to a material matter; (5) the statement was false; and (6) the statement was made knowingly and fraudulently. Mr. Gellene does not deny that the applications were sworn declarations in a bankruptcy case which were false and knowingly made. He challenges only two elements of the crime, namely that the false statements were "fraudulently made" and "material."

**13.** The bankruptcy treatise *Collier on Bankruptcy* states that a false oath or account, to be "knowingly and fraudulently" made, "must have been intentionally made with the purpose of deceiving or cheating parties affected by the bankruptcy case." 1 *Collier on Bankruptcy* ¶ 7.02[2][a][v] at 7–47 to 7–48 (Lawrence P. King ed., 15th ed. rev.1999).

**14.** See Merriam–Webster's *Collegiate Dictionary* (10th ed.1998) (synonym of "fraudulent" is "deceitful"); *Black's Law Dictionary* (5th ed. 1979) ("To act with 'intent to defraud' means to act willfully, and with the specific intent to deceive or cheat.").

the Bankruptcy Code and that the expansive scope of the statute "reaches beyond the wrongful sequestration of a debtor's property and also encompasses the knowing and fraudulent making of false oaths or declarations in the context of a bankruptcy proceeding." *Id.* at 423 (citing *Key,* 859 F.2d at 1259–60).

In addition, *Ellis* commented that the omission of material information in a bankruptcy filing "impedes a bankruptcy court's fulfilling of its responsibilities just as much as an explicitly false statement." *Id.* (affirming § 152 conviction of debtor for omission of prior bankruptcies from petition); *see also United States v. Cherek,* 734 F.2d 1248, 1254 (7th Cir.1984) (holding that failure by corporation president to list asset on corporation's bankruptcy petition was omission of material information supporting a § 152 conviction), *cert. denied,* 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985); *United States v. Lindholm,* 24 F.3d 1078, 1083 (9th Cir.1994) (affirming § 152 conviction of debtor for omission of prior bankruptcy filings). Thus, whether the deception at issue is aimed at thwarting the bankruptcy court or the parties to the bankruptcy, § 152 is designed to protect the integrity of the administration of a bankruptcy case. As one commentator has put it:

> The orientation of title 11 toward debtors' rehabilitation and equitable distribution to creditors relies heavily upon the participants' honesty. When honesty is absent, the goals of the civil side of the system become more expensive and more illusive. To protect the civil system, bankruptcy crimes are not concerned with individual loss or even whether certain acts caused anyone particularized harm. *Instead, the statutes establishing the federal bankruptcy crimes seek to prevent and redress abuses of the bankruptcy system.* Thus, most of the crimes do not require that the acts proscribed be material in the grand scheme of things, that the defen-

dant benefit in any way nor that any creditor be injured.

1 *Collier on Bankruptcy,* ¶ 7.01[1][a] at 7–15 (Lawrence P. King ed., 15th ed. rev. 1999) (emphasis added).

**2.**

Mr. Gellene's narrow reading of the statute leads him to take a narrow view of the provision's materiality requirement. In his view, the statute criminalizes only fraud that is intended to frustrate the equitable distribution of assets in the bankruptcy estate. As counsel explained at oral argument, the fraud ought to be considered material only when it is related to the estate's assets, to pecuniary and property distribution issues. Under this narrow interpretation, his failure to divulge his representation of a major secured creditor of the debtor was not material, he asserts, because it was not intended to impact on the equitable distribution of assets in the bankruptcy.

 We agree that § 152 requires that materiality be an element of the crime of bankruptcy fraud and, indeed, we have incorporated such a requirement in our analysis of § 152 fraud. *See Key,* 859 F.2d at 1261. The statute is therefore construed to require that the false oath be in relation to some material matter. *See United States v. Jackson,* 836 F.2d 324, 329 (7th Cir.1987) (citing cases). That material matter about which the misrepresentation was made could of course be the debtor's business transactions, the debtor's estate assets, the discovery of those assets, or the history of the debtor's financial transactions. *See id.* (holding that the debtor's false statements about the location of assets of the estate were material to the proceedings). However, we have never accepted Mr. Gellene's view that only misrepresentations that relate to the assets of the bankruptcy estate are material. Indeed, we, like other circuits, have rejected expressly such a reading. *See Key,* 859 F.2d at 1261 (stating that materiality does not re-

quire showing that creditors were harmed by the false statements).[15] The same commentator, addressing the materiality element, likewise has explained why a broader view of materiality than the one urged by Mr. Gellene is compatible with the purpose of the bankruptcy laws:

> Materiality in this context does not require harm to or adverse reliance by a creditor, nor does it require a realization of a gain by the defendant. Rather, it requires that the false oath or account relate to some significant aspect of the bankruptcy case or proceeding in which it was given, or that it pertain to the discovery of assets or to the debtor's financial transactions. Just what is significant is difficult to say for the general case: failing to disclose ownership of a ream of paper in a multi-million dollar bankruptcy is probably not material, but in many cases a false social security number or a false prior address may be. Statements given by individuals in order to secure a particular adjudication carry their own reliable index of materiality; the person giving the statement believed it sufficiently important—and hence, material—to the goal of obtaining the desired action.

*Collier on Bankruptcy*, ¶ 7.02[2][a][iv] at 7–46 to 7–47. We conclude that the materiality element does not require proof of the potential impact on the disposition of assets.

■ We have no doubt that a misstatement in a Rule 2014 statement by an attorney about other affiliations constitutes a material misstatement. The Bankruptcy Code requires that attorneys who seek to be employed as counsel for a debtor apply for the bankruptcy court's approval of that

employment. *See In re Crivello*, 134 F.3d 831, 835–36 (7th Cir.1998). Bankruptcy Rule 2014 requires the potential attorney for the debtor to set forth under oath any "connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr.P. 2014(a). The disclosure requirements apply to all professionals and are not discretionary. The professionals "cannot pick and choose which connections are irrelevant or trivial." *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr.W.D.Okl.1992). "[C]ounsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *Crivello*, 134 F.3d at 836; *see also Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir.1994). As Judge Kanne pointed out in *Crivello*, this procedure is designed to ensure that a "disinterested person" is chosen to represent the debtor. This requirement goes to the heart of the integrity of the administration of the bankruptcy estate. The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate. *See Crivello*, 134 F.3d at 835.

### 3.

■ We now consider whether there was sufficient evidence of Mr. Gellene's guilt. We therefore must determine, after viewing the evidence in the light most favorable to the government, whether a rational trier of fact could have found the essential elements of the offense of bank-

---

15. *See also Lindholm*, 24 F.3d at 1083–84 (criminal statute § 152 applies even if false statements do not affect the outcome of the bankruptcy proceedings); *United States v. Yagow*, 953 F.2d 427, 432–33 (8th Cir.) (citing cases and holding that debtor's sworn statement attesting to his lack of employment, aimed at securing in forma pauperis status before the tribunal, is material), *cert. denied*, 506 U.S. 833, 113 S.Ct. 103, 121 L.Ed.2d 62 (1992); *In re Robinson*, 506 F.2d 1184, 1188–89 (2d Cir.1974) (holding that materiality does not require a showing that the creditors were prejudiced by the false statement); *cf. United States v. Grant*, 971 F.2d 799, 808–09 (1st Cir.1992) (rejecting contention that § 152 implicitly requires that concealment involve a substantial amount of property material to the estate).

ruptcy fraud beyond a reasonable doubt. *See United States v. Webster,* 125 F.3d 1024, 1034 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 698, 139 L.Ed.2d 642 (1998). "Circumstantial evidence is sufficient to prove fraudulent intent and to support a conviction." *Id.*

Our review of the record verifies that the government established Mr. Gellene's knowledge of his duty to disclose. It set forth Mr. Gellene's expertise in bankruptcy and the bankruptcy court's statements alerting him to the importance of full disclosures. Mr. Gellene was fully apprised of the importance of the information that had been excluded. He had been questioned by his law partner, Toni Lichstein, several times about whether there might be a conflict of interest and whether all necessary disclosures had been made. Yet Mr. Gellene continued to withhold the information over a two-year period; he simultaneously worked on the Bucyrus bankruptcy and represented South Street, Greycliff and Salovaara without informing his client Bucyrus of the other representations.

In addition to the direct evidence of Mr. Gellene's intentional fraudulent omission of information from the Rule 2014 applications, the government offered evidence that he had committed deceptions on the bankruptcy court and other courts with respect to (1) his failure to disclose his law firm partners' interest in the Lotus Cab Company, from whom he had submitted a bill; (2) his failure to file documents in a Colorado bankruptcy court; and (3) the status of his bar memberships. Moreover, Mr. Gellene himself testified regarding his mental state; therefore, the jury had an opportunity to judge in detail his innocent explanations regarding his conduct. After viewing the evidence in the light most favorable to the government, we conclude that there was evidence from which a jury reasonably could have found beyond a reasonable doubt that Mr. Gellene knowingly and fraudulently made two false material declarations in the Bucyrus bankruptcy case.

**4.**

 Mr. Gellene claims that the court's definition of "fraudulent," which was set forth in the instructions, was erroneous. We therefore have considered the jury instructions, viewing them as a whole and acknowledging that we may overturn Mr. Gellene's conviction only if those instructions failed to treat the contested issues fairly and adequately. *See United States v. Lerch,* 996 F.2d 158, 161 (7th Cir.1993), *cert. denied,* 510 U.S. 1047, 114 S.Ct. 697, 126 L.Ed.2d 664 (1994).

The district court instructed the jury that a "statement or representation is fraudulent if known to be untrue, and made with intent to deceive." This instruction, given the facts of the case, adequately presented the issue to the jury. The defendant's conduct was to make a fraudulent statement. Because he is the attorney for the debtor rather than the debtor, his use of false statements defrauded the entire bankruptcy process when he withheld the name of a client that was the debtor's major secured creditor and of other related entities. We conclude that the instruction given in this case, which notably was given along with an instruction stating the elements of § 152 that must be proven beyond a reasonable doubt, adequately addressed the issue of intent. We hold that the district court treated all elements of the offense fairly and accurately, and accordingly we affirm the use of the jury instruction defining "fraudulent."

**B. Perjury under 18 U.S.C. § 1623**

**1.**

Mr. Gellene was convicted on Count 3 of using a document, while under oath, knowing that it contained a material falsehood, in violation of 18 U.S.C. § 1623.[16] This

---

16. The statute, in pertinent part, states:

§ 1623. False declarations before grand

charge arose from the bankruptcy court's hearing in November 1995 to consider Milbank's fee application. JNL opposed the application on the ground that Milbank had conflicts of interest in its representation of the debtor Bucyrus. Specifically, JNL challenged Milbank's relationship with Goldman Sachs.

At the fee hearing, Mr. Gellene testified on direct examination that he previously had disclosed to the bankruptcy court Milbank's representation of Goldman Sachs; in the course of his testimony, he referred to the two sworn declarations as exhibits to establish that disclosure. The second declaration in particular demonstrated that Milbank had divulged its relationship with Goldman Sachs and had put in place a "Chinese wall" to keep separate the Goldman Sachs legal representation and the Bucyrus bankruptcy work. That second declaration then made this concluding statement, alleged to be false in Count 3:

> Besides the representations disclosed in my declaration dated February 18, 1994, after due inquiry, I am unaware of any other current representation by Milbank of an equity security holder or institutional creditor of the Debtors.

Indictment, Count 3, ¶ 2.

However, when Mr. Gellene drafted this Rule 2014 disclosure statement (around March 28, 1994) and when he used it at the fee hearing (November 29, 1995), he and his firm were actively representing South

Street and Greycliff. Notably, Milbank's representation of those entities was not known at the time of the fee hearing to anyone involved in the Bucyrus bankruptcy.

### 2.

Section 1623(a), often called the "false swearing statute" to distinguish it from its older sibling, the general federal perjury statute, see United States v. Sherman, 150 F.3d 306, 310 (3d Cir.1998), punishes anyone who "knowingly makes any false material declaration" under oath in a court proceeding. 18 U.S.C. § 1623(a).[17] A material statement is one that has "a natural tendency to influence, or was capable of influencing, the decision of" the decisionmaker to which the statement was addressed. Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (citing cases as examples). Materiality is an element of the offense; it must be proven by the government and decided by the jury. See United States v. Gaudin, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); United States v. Akram, 152 F.3d 698, 700 (7th Cir.1998) ("Since Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), it has been clear that materiality under § 1623(a) is an element of the prosecution's case and must therefore be submitted to the jury and proven beyond a reasonable doubt.").

jury or court.
(a) Whoever under oath (or in any declaration ... ) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.
18 U.S.C. § 1623.

**17.** Congress adopted § 1623 in 1970 in the Organized Crime Control Act of 1970. It was enacted "to facilitate Federal perjury prosecutions· and establish a new false declaration provision applicable in federal grand jury and court proceedings." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 4007, 4008. For discussions of the similarities and distinctions of these statutes, see Dunn v. United States, 442 U.S. 100, 107–12, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); Sherman, 150 F.3d at 310–12; United States v. Molinares, 700 F.2d 647, 651–52 (11th Cir. 1983); United States v. Watson, 623 F.2d 1198, 1207 (7th Cir.1980); and United States v. Gross, 511 F.2d 910, 914–15 (3d Cir.), cert. denied, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). See also Kathryn Kavanagh Baran & Rebecca I. Ruby, Perjury, 35 Am.Crim. L.Rev. 1035 (1998).

Mr. Gellene challenges his conviction on several grounds. First, he claims that the evidence was not sufficient to prove his guilt beyond a reasonable doubt because his testimony at the fee hearing did not constitute a knowing "use" of a "false material" document. Second, he asserts (for the first time on appeal) that, because the document was literally true, his statement based on the declaration cannot form the basis for a perjury conviction. And, third, he submits that the district court should have granted the motion for judgment of acquittal. We shall address the first two contentions in some detail and, in the course of our analysis, also discuss the sufficiency of the evidence.

### a.

■ The false swearing statute, as the government seeks to apply it here, requires the "use" of a false statement. Mr. Gellene claims that his testimony at the fee hearing was entirely and historically accurate. In his view, the focus of the inquiry was on another paragraph of his March 1994 declaration, the paragraph that disclosed his relationship with Goldman Sachs. Mr. Gellene contends that he did not "use" the paragraph mentioned in the indictment because he never referred to that paragraph or used that paragraph to bolster his testimony; the inquiry was limited to Milbank's relationship with Goldman Sachs, and he made no mention at the fee hearing of the paragraph set forth in the indictment.

We cannot accept this argument. The thrust of JNL's challenge to the fee petition was a challenge to Milbank's divided loyalty. Although its allegation was limited to Milbank's association with Goldman Sachs, a fair interpretation of the record—and one the jury was certainly entitled to accept—was that JNL's foundational concern was that Milbank's divided loyalties might jeopardize the position of

the creditors. The statement at issue in the indictment informed, and assured, the bankruptcy court that, beyond the area of acknowledged concern (Milbank's relationship with Goldman Sachs), there were no other areas of representation of which Mr. Gellene was aware. The statement conveyed the message that, once he met JNL's concern about Goldman Sachs, there was no other cause for concern about Milbank's divided loyalties and the fee petition could be approved.

We believe that the district court was correct in its determination that Mr. Gellene "used" [18] the designated paragraph of the supplemental statement in his 2014 application during his testimony. His reference to—and his reliance upon—the application allowed him to demonstrate not only that he had disclosed the representation of Goldman Sachs but also that he had examined other possible areas of concern and had determined that there were no other similar representations that warranted the court's scrutiny before awarding fees.

■ For essentially the same reasons, we believe that the use of the application was material. The district court noted that a document "is material if it has a natural tendency to influence or is capable of influencing the decision of the person to whom it was addressed." R.50 at 6 (citing *United States v. Gaudin*, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), and *United States v. Ross*, 77 F.3d 1525, 1545 (7th Cir.1996)). According to the district court, the testimony of David Gelfand, Mr. Gellene's partner at Milbank who examined Mr. Gellene at the fee hearing, was sufficient evidence of materiality; Mr. Gelfand testified that the document was introduced to convince the bankruptcy court to award attorney's fees.

Our study of the record convinces us of the correctness of the district court's rul-

---

**18.** For a compendium of cases applying the term "use" in § 1623, *see* Baran & Ruby, *supra* note 17, at 1041 n. 38.

ing. The jury was entitled to believe that the statement was designed to lull the bankruptcy court and the parties into believing that there were no other Milbank relationships deserving of scrutiny before the award of fees. The jury was entitled to conclude that the sequence of events established that Mr. Gellene had knowingly used the document to convey such an impression to the bankruptcy court. Indeed, Mr. Gellene stated prior to the hearing that he intended to use the declarations in response to JNL's allegation that Milbank had conflicts of interest. David Gelfand, who examined Mr. Gellene at that hearing, later testified that Mr. Gellene had chosen to proffer his sworn declarations as exhibits and had orchestrated the subsequent questioning of his own sworn testimony. According to Gelfand, the purpose in presenting the documents was to establish that Milbank was entitled to the $2 million in fees because all potential conflicts had been disclosed and considered by the bankruptcy court. There is no question that his proffer of the statement constituted use of a material document under § 1623.

The record permitted the jury to conclude that Mr. Gellene knowingly introduced the false document in order to gain approval of Milbank's $2 million fee request. Evaluating the testimony presented to it, the jury was entitled to conclude

that Mr. Gellene had virtually bragged about the forthrightness of Milbank's disclosure of its representation of Goldman Sachs, all the while knowing that no one involved in the bankruptcy proceedings was aware of Milbank's undisclosed representations of South Street and the other entities. It was not until the next year that the falsity of that disclosure information was discovered. Only then could the United States Trustee seek return of the fees and an order of sanctions against Milbank.

Accordingly, we believe that sufficient evidence existed for the district court to find that materiality has been established.

**b.**

■■■ Mr. Gellene contends that his conviction under § 1623 cannot stand because the statement made in the paragraph set forth in the indictment is literally true. The government made no effort to prove, he contends, that Milbank's undisclosed clients—South Street, Greycliff and Salovaara—were "institutional creditors" or "equity security holders" of Bucyrus. Because there was nothing "materially false" about that paragraph of Mr. Gellene's declaration, he claims, the government could not have proven those necessary elements of the crime of perjury under § 1623. Therefore, he submits, his perjury conviction cannot be sustained.[19]

---

19. Mr. Gellene relies on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), when claiming that literally true statements cannot form the basis for a perjury conviction. In *Bronston*, the president of the debtor corporation was examined as a witness by a creditor's lawyer. He answered all the questions truthfully; however, the lawyer never asked him directly if he had a personal bank account in Switzerland, and one of his answers implied that he did not. When the government discovered the Swiss account, it charged him with perjury for misleading the questioner by answering in a literally truthful but unresponsive way. The Supreme Court characterized the lawyer's questioning of the witness as "a testimonial mishap that could readily have been reached with a single additional question by counsel alert—as every examiner ought to be—to the incongruity of

petitioner's unresponsive answer." *Bronston*, 409 U.S. at 358, 93 S.Ct. 595. The Court placed the blame on the attorney for failing "to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id.* at 358–59, 93 S.Ct. 595. It concluded that the perjury prosecution was a "drastic sanction to cure" that testimonial mishap, one that the statute did not intend. "Precise questioning is imperative as a predicate for the offense of perjury." *Id.* at 362, 93 S.Ct. 595.

As can readily be seen, *Bronston* is inapposite to the case before us. It focuses on adversary examination of a witness; it does not encompass a case in which the witness orchestrates his own false evidence under direct examination through the planned ques-

The government points out that, because Mr. Gellene has raised this issue for the first time on appeal, he may obtain a reversal only if he can demonstrate a "manifest miscarriage of justice." *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.), *cert. denied*, 517 U.S. 1200, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). It further argues that a reviewing court should uphold the conviction as long as the falsity is established by a "common sense reading" of the language used. *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir.1989). The government then submits that South Street and Greycliff were "institutional creditors" and that Mr. Gellene was fully aware that these entities were represented by Milbank at the time he stated that he was "unaware" of such creditors.[20]

The jury was entitled to credit the testimony of Alfred Eckert, partner of Mikael Salovaara and half-owner of South Street and Greycliff, who stated that South Street's first investment was a secured loan to Bucyrus in the summer of 1992. As Eckert explained, South Street had loaned $35 million to Bucyrus "and we were collateralized by all the assets of the company so that . . . we would be paid off first if there was a problem." Tr. 573. Eckert also testified that the interest of South Street certainly was affected by the Bucyrus bankruptcy. It is obvious from this testimony that, whether or not Mr. Gellene defines it as an "institutional creditor," South Street was a party in interest in the Bucyrus bankruptcy, one that should have been identified and disclosed by Mr. Gellene on his Rule 2014 declaration as long as he or his firm had any connection with it.

Because it is clear that South Street and Greycliff were institutions that had lent to and were owed millions of dollars by Bucyrus, we believe that the jury had sufficient information from the trial testimony of

---

tions of his own attorney. Mr. Gellene has no basis on which to rely on *Bronston*.

**20.** The government explained that South Street and Greycliff were investment entities engaging in the same type of transactions as Goldman Sachs. Although set up as separate "legal structures" for "legal and tax reasons," South Street and Greycliff were one and the same for operational purposes. The amount in the funds was $180 million, making it larger than many banks. The money had been raised from pension funds, insurance companies and individual investors. South Street and Greycliff were run by Mikael Salovaara and Alfred Eckert, two men who had operated similar, successful investment vehicles while working for Goldman Sachs and believed they could do the same or better away from Goldman Sachs. In essence, Eckert served as chairman and Salovaara as president.

South Street's $35 million investment in Bucyrus was a secured loan structured, in part, as a sale/lease-back of company assets. At trial, Eckert characterized the transaction: "We loaned the money and we were collateralized by all the assets of the company . . . like a mortgage so that we would be paid off first if there was a problem." Tr. 573. In the bankruptcy case, Mr. Gellene himself characterized South Street as the "major secured lender" of Bucyrus. Tr. 968.

South Street and Greycliff were multi-million dollar organizations, not individuals. As such, they were "institutions" or "institutional." South Street and Greycliff also served as major financial lenders, a characterization synonymous with "institutional creditor."

Although Mr. Gellene's brief contends that there were no institutional creditors involved in the case, Mr. Gellene's first sworn declaration stated, in part: "Milbank has advised the Debtors that it has in the past represented and currently represents certain equity security holders and institutional creditors of the Debtors in matters unrelated to the Debtors, and may in the future do so." Ex. 22, ¶ 3. The document then identifies the representation of Goldman Sachs and JNL. Mr. Gellene's second sworn declaration repeated his use of the terms "equity security holder" and "institutional creditors" when disclosing his firm's representation of Cowen & Co. and Mitsubishi International Corporation. Ex. 27, ¶ 3. Although "institutional creditor" is not defined under the Bankruptcy Code, "equity security holder" is defined as a party owning stock in the debtor corporation. *See* 11 U.S.C. § 101. But in listing Goldman Sachs, JNL, Cowen & Co. and Mitsubishi International Corporation, Mr. Gellene represented their interests as beyond simply equity security holders, and suggested that they were institutional creditors as well. *See* Ex. 22, ¶ 6; Ex. 27, ¶ 3.

Eckert and others to determine that South Street and Greycliff were institutional creditors of the debtor Bucyrus. Accordingly, it was not a miscarriage of justice for the jury to find that South Street and Greycliff fit the term "institutional creditor" and then to conclude that Mr. Gellene's supplemental declaration was false.

## C. Admissibility of Rule 404(b) Evidence

### 1.

Mr. Gellene next submits that the district court abused its discretion in admitting evidence, pursuant to Rule 404(b) of the Federal Rules of Evidence,[21] of certain other events on the ground that they were relevant and probative on the issue of intent.

During the course of trial, the court admitted evidence that Mr. Gellene had misrepresented his status as a member of the bar when applying to become a member of the bar of the Eastern District of Wisconsin: He stated that he was a member of the bar of the Southern District of New York and had been a member since 1981, but in fact he has never been a member of that bar, despite repeated appearances in that court over the years. In addition, Mr. Gellene practiced law in New York State between 1981 and 1990 without ever joining that bar. During that time, he represented himself to be a member of the New York bar in legal publications and court filings. The court also admitted evidence of (1) Mr. Gellene's misrepresentation to the Colorado bankruptcy court concerning his failure to produce discovery documents, and (2) Mr. Gellene's misrepresentation to the Wisconsin bankruptcy court in this case concerning his law firm's relationship with Lotus Cab Company.

Mr. Gellene explained that he had passed the bar but had neglected to complete the requisite paperwork to be li-

censed. He also admitted that he did not tell his law firm that he was not a member of the bar and, as a result, practiced law for almost nine years without a proper license. Nevertheless, he contends that the government sought to admit this irrelevant evidence to prove his propensity to make misrepresentations, thereby allowing the jury to infer that he must have been untruthful and even must have fraudulently intended the charged conduct. In his view, stating that he was a licensed attorney when he only had passed the bar exam, although not commendable conduct, is not equivalent to the state of mind involved with providing false testimony as to a material issue under litigation.

In admitting the evidence, the district court reasoned that, by denying that he had the requisite fraudulent intent for the charged crimes, Mr. Gellene had made intent an issue in the case; therefore, the court concluded, the government was entitled to rebut that contention with evidence of other bad acts that tended to undermine the defendant's innocent explanations for his act. Concerning Mr. Gellene's bar status, the court determined that there was clear evidence of (1) his knowledge that he was not a member of the New York state bar and (2) "his continuing intent for a period of almost nine years to deceive anyone who would have an interest [in] believing that indeed he was a member of the New York bar." Tr. 1480. The court then determined that this intent to deceive concerning his bar status was similar to his intent to defraud, to deceive and to perjure himself under Counts 1, 2 and 3 of the indictment. It noted Mr. Gellene's status as an officer of the court—in the bankruptcy court in Milwaukee, a federal court in New York, a bankruptcy court in Denver, or elsewhere—and then found that his conduct in those courts was similar and "appropriate to consider on the

21. Rule 404(b) of the Federal Rules of Evidence provides that evidence of prior crimes, wrongs or acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident" but not to prove a defendant's character in order to show he acted in conformity with the charged offense. Fed.R.Evid. 404(b).

very narrow issue of this defendant's intent in his candor with the United States Bankruptcy Court in the Eastern District of Wisconsin." Tr. 1482.

2.

■■■ We review the district court's determinations concerning the admissibility of evidence under the abuse of discretion standard. *See United States v. Lerch,* 996 F.2d 158, 162 (7th Cir.1993). Our circuit's traditional four-part test to determine the admissibility of evidence under Rule 404(b) permits the admission of prior acts when:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Asher,* No. 98–1700, 178 F.3d 486, 491 (7th Cir.1999). Our review, on appeal, of the district court's application of Rule 404(b) requires us to "ascertain whether the tendered evidence is directed toward establishing a matter in issue *other than* the defendant's propensity to commit the charged crime." *United States v. Allison,* 120 F.3d 71, 74 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 455, 139 L.Ed.2d 389 (1997) (emphasis added). When the defendant is charged with a specific intent crime, as Mr. Gellene is, "the government may present other acts evidence to prove intent." *United States v. Lewis,* 110 F.3d 417, 420 (7th Cir.) (quoting *United States v. Long,* 86 F.3d 81, 84 (7th Cir.1996)) (citations and internal quotation marks omitted), *cert. denied,* ——

U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). The admission of evidence of other crimes for that limited purpose is proper.

We cannot say that the district court abused its discretion in admitting the evidence. The district court was correct in its determination that Mr. Gellene had placed his intent in issue. It was clear from the parties' opening statements that the facts were basically not in dispute and that the focus of the trial would be on the intention underlying Mr. Gellene's conduct.[22] On this record, we also think that the district court was entitled to conclude that Mr. Gellene's false representations regarding his bar status and his other misrepresentations were similar enough in nature to the charged offenses to be relevant. Both the charged conduct and these other misrepresentations involve intentional misrepresentations before a court. The evidence admitted by the district court, like the offenses of conviction, tended to show intentional dishonesty, absence of mistake, and a cavalier disregard for the truth in his dealings with tribunals. For instance, Mr. Gellene's intentional deception in falsely representing to various courts (including the United States District Court for the Eastern District of Wisconsin) that he was a member of the bars of other courts, when he was not, is not dissimilar to his intentional deception in falsely representing to the bankruptcy court that he had no connection with other parties in interest in the bankruptcy, when in fact he was representing the major secured creditor. Certainly, his attempt to treat the earlier conduct as de minimis, trivial, a matter of neglect, a matter of embarrassment but not a knowing deception—when the circumstances evince knowing deception—is similar to the dishonesty reflected in his filings of the two fraudulent disclosure statements and the perjurious statement he made subsequent to the filing of

---

**22.** *See* Tr. 60–61 (AUSA: "[John Gellene is] going to tell you that he didn't knowingly deceive anybody, that wasn't his intention at all"); Tr. 1087 (Counsel for Gellene to the court: "[T]he issue in this case is the defendant's state of mind.").

those documents in order to win the requested $2 million fee award.[23]

Even when such evidence has a slight tendency to show Mr. Gellene's propensity to commit wrongs, "its predominant effect pertained to the legitimate purpose of proving [the defendant's] intent." *United States v. Sinclair*, 74 F.3d 753, 761 (7th Cir.1996) (affirming district court's discretionary decision to admit evidence that the defendant had signed certificates affirming that he complied with the bank's code of conduct but had not obtained permission to serve as an officer of another corporation, as the code required). We note, moreover, that the district court instructed the jury that Mr. Gellene was "not on trial for any act or conduct not alleged in the indictment" and that the jury was allowed to consider "evidence of acts of the defendant other than those charged in the indictment . . . only on the question of the defendant's intent." Jury Instructions at 4, 9. Given these limiting instructions, we cannot say that the danger of prejudice outweighed the probity of the evidence. The district court did not abuse its discretion in admitting evidence of Mr. Gellene's false representations and omissions concerning his bar status with respect to the "narrow issue" of his intent.

### D. The Court's Sentencing Determinations

#### 1. U.S.S.G. § 3B1.3

Mr. Gellene contends that the district court erroneously enhanced his conviction on Count 3, the perjury charge, under U.S.S.G. § 3B1.3 for abuse of a position of trust. According to Mr. Gellene, he does not occupy a position of trust with respect to his client Bucyrus, the bankruptcy court, the creditors, or his law partners.

We review a district court's interpretation of "position of trust" de novo. However, because the question whether the defendant occupied a position of trust is a factual one, we review that determination for clear error. *See United States v. Bhagavan*, 116 F.3d 189, 192 (7th Cir. 1997). The § 3B1.3 adjustment is appropriate if (a) the defendant occupied a position of trust, and (b) his abuse of the position of trust significantly facilitated the offense. *See United States v. Emerson*, 128 F.3d 557, 562 (7th Cir.1997). Whether a defendant holds a position of trust depends on the amount of professional managerial discretion he has been given, *see* § 3B1.3, or on his "access or authority over things of value." *United States v. Lamb*, 6 F.3d 415, 419 (7th Cir.1993). When a person is given a great deal of autonomy by his employer, for example, and is in a position to steal or to do other harm without being caught, that person, if he abuses that trust, may be punished more heavily. *See United States v. Deal*, 147 F.3d 562, 563 (7th Cir.1998).

Mr. Gellene was a bankruptcy lawyer representing a large corporate client in bankruptcy. He held a position of considerable professional discretion. *See* § 3B1.3 n. 1 (giving the example that a lawyer who embezzles from his client abuses a position of trust). In our view, Mr. Gellene, as lead Milbank lawyer in the

---

23. *See, e.g., Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 379 (6th Cir.1997) (holding that evidence that defendant, plaintiff's former client, consistently failed to pay other lawyers was relevant to prove the element of intent to defraud); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co.*, 45 F.3d 969, 979–80 (5th Cir.1995) (affirming trial court's discretion to admit evidence of the bank officer's prior bad loans to demonstrate the bank officer's intent to make fraudulent loans in this case); *United States v. Grissom*, 44 F.3d 1507, 1513–14 (10th Cir.) (affirming trial court's discretion to admit evidence of defendant's underreporting of work hours and falsified payroll records to establish defendant's intent to make false statements on loan disbursement requests, particularly because the defendant's theory of defense was lack of intent to make false statements), *cert. denied*, 514 U.S. 1076, 115 S.Ct. 1720, 131 L.Ed.2d 579 (1995); *United States v. Jerkins*, 871 F.2d 598, 604 (6th Cir.1989) (agreeing with district court's conclusion that the failure to file a return and the evasion of taxes are substantially similar).

Bucyrus bankruptcy, occupied a position of trust.

■ We next ask, therefore, whether Mr. Gellene's abuse of his role as attorney for the debtor significantly facilitated the commission of the perjury. The district court determined that it did; Mr. Gellene, as counsel for Bucyrus, abused that position of trust by concealing critical information from his client, namely his representation of the senior secured creditor, South Street. Mr. Gellene's offense was lying about those representations in the Rule 2014 disclosure statements, at the bankruptcy fees hearing, and over a two-year period during which Bucyrus was never told of the conflicting representation. As the district court stated, such nondisclosure constituted a serious breach of trust and of "the ethical obligations that one owes to his client to be free from all the intrusions that surround potential conflicts of interest." Sent. Tr. 103.

We believe there was no error in the district court's imposition of the enhancement. Mr. Gellene's position representing the debtor brought with it fiduciary duties to act in the debtor's interest throughout the bankruptcy proceeding. *See Bhagavan*, 116 F.3d at 193 (concluding that the president/majority shareholder, with fiduciary duties to act in the interests of minority shareholders, occupied a position of trust). His undisclosed representation of

the senior secured creditor of the debtor certainly created a potential if not actual conflict of interest and thus was a breach of his position of trust with the debtor. Mr. Gellene also abused his position of trust as an officer of the bankruptcy court by using his fraudulent sworn document to verify his perjurious sworn testimony.

### 2. Imposition of fine

■ Mr. Gellene claims that the district court did not properly consider his inability to pay the $15,000 fine imposed on him at sentencing. He asserts that the government miscalculated his net worth at $360,131.50 and that he actually is insolvent with three daughters dependent upon him for financial support. According to Mr. Gellene, the fine was imposed in disregard of the applicable sentencing standards and must be set aside.

■ Section 5E1.2 mandates that a district court impose a fine on a defendant unless he "establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). It is the defendant's burden to demonstrate that he lacks the ability to pay. It is the court's duty to consider the factors for imposition of a fine found in U.S.S.G. § 5E1.2(d) and 18 U.S.C. § 3572.[24] *See United States v. Young*, 66 F.3d 830, 838 (7th Cir.1995). We do not require that the sentencing court make specific findings regarding

**24.** 18 U.S.C. § 3572(a) states:
(a) Factors to be considered.—In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—
(1) the defendant's income, earning capacity, and financial resources;
(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;
(5) the need to deprive the defendant of illegally obtained gains from the offense;
(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;
(7) whether the defendant can pass on to consumers or other persons the expense of the fine; and
(8) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

each of the relevant factors, however; in fact, the articulation of findings may be satisfied by adopting the PSR findings. *See United States v. Bauer*, 129 F.3d 962, 966 (7th Cir.1997). "[T]he sentencing court must consider the relevant factors and provide a reasoned and reviewable basis for its decision to impose a fine." *Id.* at 968.

In this case, the record makes clear that the district court spent considerable time properly considering the relevant factors. The court followed the PSR's factual findings, questioned Mr. Gellene concerning his current financial situation, and then asked Mr. Gellene and his attorney to meet over lunch with the probation officer who prepared the presentence report in order to provide to the court "a little detail about where all this money went in the last six years." [25] Sent. Tr. 69. The probation officer's notes from that discussion became a supplement to the PSR—a supplement created by both parties. *See Bauer*, 129 F.3d at 969 (recognizing that the defendant approved the supplement to the PSR). The court reviewed the material and questioned Mr. Gellene further concerning the estimated unpaid taxes and life insurance. He noted the high cost of living in New York and costs involved in schools for his daughters. After assessing Mr. Gellene's financial situation along with the nature of his conduct, the court believed that "the interests of justice and the interests of society" required some fine within the guideline range. Sent. Tr. 146. It determined that $15,000 was the appropriate fine within the guideline fine range of $4,000 to $40,000 for his offense level.

In our view, the district court gave Mr. Gellene the opportunity to prove his inability to pay a fine when it asked him to meet again with the probation officer over lunch. It carefully reviewed Mr. Gellene's claim of insolvency during the sentencing hearing before rejecting it. Mr. Gellene has given

us no grounds for re-evaluating the district court's decision on this matter. The district court was within its discretion, and committed no error, when it fined Mr. Gellene. Moreover, " 'we have no authority to inquire into the precise amount of the fine the district judge specified,' because claims 'that the judge should have made a greater departure ... [are] outside our jurisdiction.' " *United States v. Sanchez Estrada*, 62 F.3d 981, 995 (7th Cir.1995) (quoting *United States v. Gomez*, 24 F.3d 924, 927 (7th Cir.), *cert. denied*, 513 U.S. 909, 115 S.Ct. 280, 130 L.Ed.2d 196 (1994) (citation omitted)); *see also Young*, 66 F.3d at 839–40 (concluding that we are without authority to depart below the minimum fine level).

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

25. The presentence report listed Mr. Gellene's net worth at $360,131.50. It included a pension fund of $310,000, a savings account of $55,000, and a checking account of $5,000. At the sentencing hearing, the probation officer reported that Mr. Gellene earned $2,720,000 in income from Milbank from 1992 to 1996; Mr. Gellene did not dispute this amount.