UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert DORSEY, Defendant–Appellant.

No. 93–3148.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1994.

Decided June 17, 1994.

Thomas Edward Leggans (argued), Office of U.S. Atty., Crim. Div., Fairview Heights, IL, for plaintiff-appellee.

Renee E. Schooley, Federal Public Defender, Andrea L. Smith, East St. Louis, IL, for defendant-appellant.

Before BAUER, FLAUM, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

Car dealer Robert Dorsey was convicted of nine counts of bank fraud in violation of 18 U.S.C. § 1344 and one count of arson in violation of 18 U.S.C. § 844(i). The district court sentenced Dorsey to a prison term of 28 months. The court also ordered him to pay, in $100 monthly installments, $109,-477.62 as restitution to one of his victims, the First National Bank of Highland in Highland, Illinois. Dorsey appeals.

I.

All of this started in 1986, when Robert Dorsey opened Bob's Highland Chrysler in Highland, Illinois. Dorsey purchased cars directly from Chrysler, then re-sold the cars to the consuming public. To purchase the cars from Chrysler, Dorsey obtained a "floor-plan" loan from the First National Bank of Highland. Dorsey ordered cars from a Chrysler plant in Dearborn, Michigan, and First National paid Chrysler for the cars on Dorsey's behalf. Chrysler then sent invoices and certificates of origin for the cars to First National, which First National held as security for the loan. Dorsey sold the cars and held the proceeds of the sales in trust for First National. Dorsey then would pay First National for a particular car and First National would give Dorsey the certificate of origin for that car. Once Dorsey obtained a car's certificate of origin, he could apply for the car's title on behalf of its purchaser.

About once a month, First National would conduct surprise "floor plan checks." First National employees would visit the dealership and check the cars that were supposed to be on the lot against the certificates of origin held by First National. Each certificate of origin listed the vehicle identification number for each car.

In the Spring of 1989, First National discovered that Dorsey had sold cars that First National thought were unsold. First National also learned that Dorsey had ordered duplicate certificates of origin from Chrysler. Eventually, First National held nine certificates of origin to cars for which it had never been paid. Dorsey sold those nine cars, but lied to First National employees about that fact during the floor plan checks; he never paid First National. Further, on at least three occasions, Dorsey tried to circumvent First National by ordering duplicate certificates of origin from Chrysler. Dorsey also failed to apply properly for the titles to the nine cars and did not give the titles to the buyers.

Dorsey renegotiated the terms of his ongoing relationship with First National numerous times. It was no use. He continued to have business and financial problems. Dorsey tried to solve these problems by selling his personal property, and he even gave First National a second mortgage on his home.

Not surprisingly, the relationship between Dorsey and First National soured as First National officials became concerned about their missing collateral. First National's fears increased when Chrysler mistakenly sent First National one of the duplicate certificates of origin which Dorsey ordered. Eventually, in 1990, First National stopped negotiating with Dorsey and decided to take another approach—civil litigation. First National sued Dorsey.

In March of 1989, the Illinois Secretary of State began an investigation into Dorsey's dealership. On June 27, 1990, Illinois Secretary of State Investigator John Herndon wrote Dorsey a letter which explained that Herndon planned to review all of Dorsey's dealership records. A week later, on July 4, 1990, a fire engulfed Bob's Highland Chrysler. After a valiant effort, Highland firemen eventually extinguished the blaze.

Larry Gilbert, a detective in Highland's "cause and origin" team, was assigned to the case. The "cause and origin" team is a squad of local police and fire officials that investigates fires. Gilbert and other squad members investigated the scene. They discovered that an electric iron had been connected to a timer, plugged into an electrical

outlet, and placed over a pile of papers and files that concerned Bob's Highland Chrysler. The files and iron also were doused with an accelerant. Gilbert suspected that Dorsey had torched his business and instructed his officers to watch Dorsey closely when he arrived at the scene.

Dorsey did not disappoint. When he arrived, Dorsey looked immediately to where the iron had been located. Later, squad members received Dorsey's written consent to enter the business and continue their investigation.

On July 10, 1990, Dan Connington, an investigator for the insurance company that insured the burned building, contacted Gilbert. Dorsey agreed to allow Connington to search the building on the condition that Highland police officers accompany him. Additionally, Connington provided another consent to search form, which Dorsey signed. Gilbert then assigned Highland police officer Scott Manville to accompany Connington to the burned building.

Connington and Manville went to the burned building and looked around. They noticed that some gas cans were still in the building and told Gilbert about them. Gilbert returned and removed the gas cans.

On July 19, 1990, William Pierce, Highland's Director of Public Safety, went to Bob's Highland Chrysler to inspect the burned building. When Pierce arrived, he saw that a gas can was sitting in the middle of the floor. Pierce assumed that his officers had been careless and returned to the Highland police headquarters to question Gilbert. Gilbert assured Pierce that he and other officers had removed all the gas cans from the burned building.

Pierce and Gilbert returned to Bob's Highland Chrysler to investigate further. When they arrived, Gilbert stepped through an open door, saw the gas can and additional burn damage, and realized that there had been a second fire. Gilbert also saw an auto dealer "police book" lying on top of a desk and smelling of accelerant. (The police book is a book which car dealers maintain to record purchaser information about the cars they sell.)

The cover of the police book was charred, but its pages were intact. Gilbert noticed the police book because he knew that the Federal Bureau of Investigation and the Illinois Secretary of State were investigating Dorsey for fraud related to his automobile sales. Gilbert also knew that Herndon had requested the book and that Dorsey had failed to produce it.

Gilbert decided to act. He seized all of the records in the building. Later that day, Gilbert spoke with Dorsey. Dorsey explained that the only people who had permission to be in the building were Highland police officers and insurance investigators.

Dorsey was indicted and convicted.

## II.

Dorsey raises several issues on appeal. We discuss three of them.

### A. Abuse of Position of Trust

The district court enhanced Dorsey's sentence two levels pursuant to U.S.S.G. § 3B1.3 because it concluded that Dorsey abused a position of trust. Section 3B1.3 directs the district court to increase a criminal defendant's sentence by two levels "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Section 3B1.3 requires the court to determine (1) whether a defendant occupies a position of trust; and, if so, (2) whether the defendant abused that position in a manner that significantly facilitated the commission or concealment of the offense. *United States v. Boyle,* 10 F.3d 485, 488 (7th Cir.1993); *United States v. Lamb,* 6 F.3d 415, 421 (7th Cir.1993).

The interpretation of the term "position of trust" is a legal question that we review *de novo. Boyle,* 10 F.3d at 489. Whether a particular defendant, like Dorsey, occupied such a position is a question of fact that we review under the clearly erroneous standard. *Id.*

Dorsey contends that his position *vis a vis* First National was not a position of trust.

Instead, Dorsey argues that his was nothing more than a standard commercial relationship with First National to finance the purchase of cars for resale by his car dealership.

■ As a general matter, a position of trust is characterized by "access or authority over valuable things." *Boyle,* 10 F.3d at 489; *Lamb,* 6 F.3d at 421. Of course, access or authority alone is not sufficient. A bank teller, for example, has access or authority over valuable things-money-but the abuse of a position of trust "would not apply to an embezzlement by an ordinary bank teller." U.S.S.G. § 3B1.3, comment. (n. 1).

The district court found that the agreement between Dorsey and First National was a "standard commercial agreement." The court concluded that, although it was a close question, the agreement set up a "form of a trust" which Dorsey abused.

The caselaw in this area is instructive. In *United States v. Kosth,* 943 F.2d 798, 800 (7th Cir.1991), the defendant operated a credit bureau and sold credit reporting equipment. *Id.* He obtained an account with a bank which entitled him to process his company's credit card transactions through the bank. The defendant used fraudulent and altered credit cards to receive payment from the bank for phantom purchases of merchandise. *Id.* We reversed the district court's enhancement for abuse of a position of trust because the defendant in *Kosth* was involved in a standard commercial relationship. *Id.* We noted that the defendant's arrangement with the bank was the same as that of any other merchant; there was no special element of private trust involved. The defendant in *Kosth* was "an ordinary merchant customer of the bank who committed fraud by abusing his contractual and commercial relationship with the bank." *Id.*

More recently, in *Boyle,* the defendant was president of an armored car company which operated as a supplier of coin and currency and as a messenger. The defendant's armored car company contracted with the Federal Reserve Bank ("Fed") to store a large volume of the Fed's coin and to deliver this coin to the Fed's customers. The defendant was to keep the Fed's deposit separate from other funds, was not authorized to used the

coin for its own purposes, and was to prepare daily and weekly reports which apprised the Fed of the total amount of the Fed's coin that the defendant's company stored. In fact, the defendant intermingled the Fed's coin with other funds and misappropriated substantial sums of the Fed's deposit for personal use and for use by the company. *Boyle,* 10 F.3d at 488.

We affirmed the district court's enhancement of the defendant's sentence in *Boyle* because the defendant acted as an agent of his victims. *Id.* at 489. Conversely, we distinguished *Kosth* for the reason that the defendant in *Kosth* was simply an account holder at the bank he defrauded.

■ As between *Kosth* and *Boyle,* Dorsey's position is closer to that of the defendant in *Kosth.* The relationship between Dorsey and First National, in the words of the district court, was "a standard commercial agreement between a lending institution, bank and an automobile dealership." It did not involve a position of trust.

■ Our other cases in this area make the point that to impose a sentence enhancement for abuse of a position of trust, there must be something more than a mere commercial relationship between the parties. *See United States v. Parker,* 25 F.3d 442 (7th Cir.1994) (state trooper abused position of public trust when trooper aided commission of robbery); *Lamb,* 6 F.3d at 421 (defendant mail carrier who took oath to uphold the law abused position of public trust when defendant embezzled United States mail); *United States v. Polland,* 994 F.2d 1262, 1270 (7th Cir.1993) (defendant criminal defense lawyer abused position of trust when defendant sold client's cocaine and pursued client's appeal), *cert. denied,* —— U.S. ——, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994).

We reverse the district court's decision to enhance Dorsey's sentence for abuse of a position of trust and remand the case for resentencing.

*B. Motion to Suppress*

Prior to trial, Dorsey moved the district court to suppress evidence seized from Bob's

Highland Chrysler on July 19, 1990. The district court held a hearing on the matter and denied Dorsey's motion. Dorsey urges us to reverse the district court's denial of his motion to suppress. He claims that the July 19 search and seizure violated the Fourth Amendment guarantee that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

The Fourth Amendment, as its language indicates, does not prohibit all state-initiated searches and seizures, but only those that are "unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). By denying Dorsey's motion to suppress, the district court, of course, concluded that the July 19, 1990 search and seizure was reasonable. We review the district court's factual and legal determinations with respect to Dorsey's motion to suppress for clear error. *United States v. Rice*, 995 F.2d 719, 722 (7th Cir. 1993).

Warrantless searches, like the one Dorsey challenges in this case, are unreasonable *per se* unless one or more of a few exceptions apply. One of these exceptions is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

Consent searches are a standard investigatory technique used by law enforcement agencies. Such searches normally occur on the roadside or in a person's home or office, often under informal and unstructured conditions. *Id.* at 231, 93 S.Ct. at 2049. They are acceptable because it is reasonable for law enforcement to conduct a search once they have been permitted to do so. *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1804. The standard for measuring the scope of a person's consent, for Fourth Amendment purposes, is "objective reasonableness," which the Supreme Court defines as that which "the typical reasonable person [would] have understood by the exchange between the [law enforcement official] and the suspect." *Id.* at 251, 111 S.Ct. at 1803–04.

In this case, Dorsey signed a written consent to search form on July 4, 1990 after the first fire at Bob's Highland Chrysler. Five days later, on July 9, 1990, Dorsey signed another consent to search form with his insurance company. And Dorsey's second written consent came only after insurance investigator Connington agreed to allow Highland police officers to join Connington's search and investigation. Finally, on July 19, 1990, after the second fire, Dorsey stated to Detective Gilbert that he authorized only members of the Highland Police Department and his insurance company to be in Bob's Highland Chrysler.

Dorsey and other Highland officials understood Dorsey's consent—actually, his repeated consents—to give them permission to gather any evidence that they might need to determine the origins of the two fires. Dorsey's consents were open-ended, and, importantly, unrevoked. Given all of this, we conclude that the July 19, 1990 search and seizure was objectively reasonable. The district court correctly denied Dorsey's motion and certainly did not commit any clear error in doing so.

## C. Restitution

The district court ordered Dorsey to pay restitution of $109,477.62, in monthly $100 installments, but did not fine Dorsey. The court waived a fine because it found that Dorsey's financial situation was such that he could not pay a fine. Dorsey argues that if he could not financially pay a fine, then he could also not pay restitution. Dorsey points out that the presentence report ("PSR") indicates that he declared bankruptcy, that he has a young child, and that his only income is that of his wife's $1,800 monthly salary. Dorsey also argues that the district court failed to consider the required statutory factors before it ordered him to pay restitution.

The Victim and Witness Protection Act of 1982 authorizes federal district courts to order restitution. 18 U.S.C. § 3663(a). In determining whether to order restitution under section 3663, a district court "shall" consider a set of statutorily enumerated factors. 18 U.S.C. § 3664(a). These are: "the amount of

the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." *Id. See also* U.S.S.G. § 5E1.1, comment. (backg'd.) (listing the factors the district court must consider pursuant to section 3664(a)). A court may order restitution paid all at once or, alternatively, order that a criminal defendant make restitution within a specified period or in specified installments for a period of up to five years. 18 U.S.C. § 3663(f). A court may decline to order restitution if it determines that "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims." 18 U.S.C. § 3663(d).

The United States Sentencing Guidelines implement these statutory requirements. The Guidelines provide that the district court "shall" order restitution if such order is authorized under sections 3663 and 3664. U.S.S.G. § 5E1.1(a). The Guidelines also provide that restitution should not be ordered if full restitution has already been made or—in language that tracks section 3663(d)—if "the complication and prolongation of the sentencing process resulting from the fashioning of a restitution requirement outweighs the need to provide restitution to any victims through the criminal process." U.S.S.G. § 5E1.1(b). If the court does not order restitution, it must state its reasons for not doing so. U.S.S.G. § 5E1.1, comment. (backg'd.).

■■■■ We review the district court's decision to order restitution for abuse of discretion. *United States v. Boula,* 997 F.2d 263, 267 (7th Cir.1993). We will sustain the district court's decision if the court considered the statutorily required factors. *United States v. Simpson,* 8 F.3d 546, 551 (7th Cir. 1993).

■■■■ Dorsey argues initially that the district court failed to consider the required factors before it ordered him to pay restitution. This argument is unconvincing. The court adopted the PSR, which detailed Dor-

sey's education and work history, his financial status (and that of his family), and his educational background. Also, at his sentencing hearing, the court commented that it considered Dorsey's unemployment. Additionally, the court reflected that "you can't get blood from a turnip."

The district court tailored the restitution order to meet Dorsey's situation by ordering Dorsey to pay restitution in $100 monthly installments. The district court clearly contemplated the requisite statutory factors. *See, e.g., Simpson,* 8 F.3d at 551 (court considered mandatory factors when it adopted presentence report); *United States v. Gio,* 7 F.3d 1279, 1292 (7th Cir.1993) (same).

■■■■ Dorsey argues next that the PSR shows that he is unable to pay restitution. This argument is unpersuasive. The PSR illustrates that Dorsey has earned substantial amounts of money in the past and has a substantial work history. It was perfectly appropriate for the court to conclude that Dorsey can and will do the same in the future. And as we have pointed out before, a criminal may be ordered to pay restitution if there is some likelihood that he will acquire the resources to do so in the future. *See Simpson,* 8 F.3d at 551; *Gio,* 7 F.3d at 1292. Upon his release from prison, Dorsey should be able to earn enough money to contribute to the $100 per month payments.

■■■■ Dorsey finally contends that the district court should not have ordered him to pay restitution because it found that he was not financially able to pay a fine. This is an interesting, though unavailing, point.

■■■■ Fines and restitution are different animals and are treated differently by both the Guidelines and the United States Code. The Code directs the courts to impose a fine in a particular case "only to the extent that such fine . . . will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572. The Guidelines similarly require the courts to consider any restitution that the defendant is obligated to pay before it orders a fine. U.S.S.G. § 5E1.2(d). And as we pointed out in *United States v. Berman,* 21 F.3d 753, 758 (7th Cir.1994), a criminal might be able to pay either a fine or restitution but not both. As between the two, restitution is

preferred because it directly compensates the victim or victims of a particular criminal's crimes.

Dorsey counters by pointing to our decision in *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993). In that case, the district court ordered the defendant to pay restitution, but found that he could not pay any fine, even in installments, and was unlikely to become able to do so at any time in the foreseeable future. *Id.* at 247–48. Therein lies the difference. Unlike *Ahmad,* the district court in this case found as fact that Dorsey was not *now* able to pay a fine along with restitution. Given a choice between a fine and restitution, the court correctly opted for restitution, structured in monthly installments to meet the unique needs of Dorsey's financial and personal situation.

### III.

We have carefully considered the other issues raised by Dorsey and conclude that they are without merit and do not warrant discussion. We reverse the district court's decision to enhance Dorsey's sentence for abuse of a position of trust, and remand this case to the district court for resentencing. In all other respects, Dorsey's sentence and convictions are affirmed.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.