In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3070

United States of America,

Plaintiff-Appellee,

v.

Surya Prasad L. Davuluri,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 98 CR 50033--Philip G. Reinhard, Judge.


Argued January 16, 2001--Decided February 7, 2001



        Before Flaum, Chief Judge, and Posner and Coffey,
Circuit Judges.

        Flaum, Chief Judge.  Surya Prasad L. Davuluri
appeals his convictions for wire fraud, mail
fraud, and interstate transportation of a
security taken by fraud, as well as his sentence.
He claims that the evidence was insufficient to
demonstrate his intent to defraud, that he
obtained the security by fraud, or that the
security was worth the minimum statutory
requirement. He appeals his sentence on the
grounds that he does not qualify for an abuse of
a position of trust enhancement. For the reasons
stated herein, we affirm the defendant's
convictions and sentence.

I.  Background

        Davuluri, burdened by loans and promises to
repay people whose money he had previously lost
investing in the markets, approached Dr. Namburu
Ramanajaru ("Dr. Raju"), a cardiologist living in
Illinois, with an offer to engage in commodities
trading on the doctor's behalf. Dr. Raju
initially rebuffed this proposal, but accepted
after Davuluri stressed his commodities expertise
(including falsely claiming to have studied
"financial engineering" at the University of
Michigan) and emphasized that no more than ten
percent of the $50,000 he was urging Dr. Raju to
invest would be at risk. In his testimony, other

factors that Dr. Raju listed that induced him to agree to Davuluri's proposal were their shared cultural heritage (both are from the Andrha Pradesh region of India) and Davuluri's claim that a Hindu priest had recommended that he talk to the cardiologist. Dr. Raju agreed to provide $50,000 for Davuluri to begin trading on the doctor's behalf. What Davuluri was to receive for his services was a disputed issue at trial. Dr. Raju testified that the two had an agreement to split any profits fifty-fifty and additionally that Davuluri could obtain a loan from the doctor's fifty percent. Davuluri claims that the only agreement was that he could obtain a loan from the profits, all of which would go to Dr. Raju.

Davuluri opened an account at the Detroit, Michigan office of Merrill Lynch and impersonated Dr. Raju without the latter's knowledge in all of Davuluri's dealings with Merrill Lynch employees. By claiming to be Dr. Raju, Davuluri instructed Merrill Lynch to increase the net worth and risk capital amounts listed on the doctor's financial forms without the real Dr. Raju's consent or knowledge, eventually reaching numbers twenty-five to thirty times greater than those that the cardiologist had actually written. Such adjustments permitted Davuluri to trade a larger number of contracts. Davuluri also forged Dr. Raju's signature on one of these forms.

Davuluri's first day of trading exposed Dr. Raju to a risk of losing $21,000, far greater than $5,000, the maximum amount Davuluri had told Dr. Raju that he could lose. The trading went well at first, with the account increasing in value to over $200,000. During these times, Dr. Raju received statements from both Davuluri and Merrill Lynch, which he did not fully understand. Davuluri and the doctor also talked over the phone about the profits being generated and Davuluri's family back in India. Dr. Raju apparently exercised no control over Davuluri's activities and had no input in the latter's trading decisions.

The account began to sour when Davuluri began selling Japanese Yen contracts. Unfortunately for Davuluri, the value of the Yen started to increase to unprecedented highs. Because of the inflated numbers on Dr. Raju's financial forms, Davuluri had been able to sell a large number of these contracts. Thus, he took a huge hit with the Yen climbing upward, and the account went $400,000 into the negative. Davuluri initially hid these losses from Dr. Raju and continued to tell him that his account was performing excellently. However, when Merrill Lynch issued a margin call, Davuluri returned to Dr. Raju,

told him about the losses, and informed the doctor that if he did not transfer $400,000 to Merrill Lynch the account would be liquidated. By emphasizing that the additional funds would be safe and not at risk, Davuluri cajoled Dr. Raju into writing a $400,000 check on an account at Fidelity Investments ("Fidelity") that was in the name of the cardiologist's wife. The check had two signature lines but Dr. Raju signed only one. The doctor testified that others had previously accepted checks with only his signature and that Fidelity always honored such checks. Davuluri took the check from the doctor in Illinois and hand-delivered it to Detroit, but Merrill Lynch, which had already liquidated the account without informing Davuluri or Dr. Raju, refused the doctor's check. The account sustained a loss of $785,907, which was apportioned between Merrill Lynch and Dr. Raju in arbitration.

One of Dr. Raju's friends urged him to notify law enforcement authorities about Davuluri's conduct. He did and the ensuing FBI investigation led to a five count indictment against Davuluri. Count I alleged mail fraud, 18 U.S.C. sec. 1341, Counts II-IV alleged wire fraud, 18 U.S.C. sec. 1343, and Count V alleged transporting in interstate commerce a fraudulently taken security worth $5,000 or more, 18 U.S.C. sec. 2314. The prosecution presented the evidence described above, and the jury found Davuluri guilty of all five counts. At sentencing, the district court imposed a two level enhancement for abuse of a position of trust. The district court cited Davuluri's discretionary authority over Dr. Raju's account, Davuluri's claims of financial expertise, and Davuluri's exploitation of cultural ties to Dr. Raju to justify the enhancement.

II.  Discussion

Davuluri appeals both his convictions and his sentence. He attacks Counts I-IV by claiming that the evidence was insufficient to prove that he formed the specific intent to defraud Dr. Raju. He contends that the Count V conviction is invalid because he did not obtain Dr. Raju's check by fraud and the check was valueless. In the alternative, Davuluri claims the district court erred in imposing the abuse of a position of trust sentencing enhancement because he did not have a formal position of trust, like a broker, nor did he form close personal ties with Dr. Raju.

A.  Intent to Defraud

Under the standard formulation of the elements of wire or mail fraud, the government must prove:

(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail (for 18 U.S.C. sec. 1341) or wires (for 18 U.S.C. sec. 1343) in furtherance of the fraudulent scheme. See United States v. Ross, 77 F.3d 1525, 1542 (7th Cir. 1996). Davuluri argues that the government failed to prove the second element, intent to defraud, beyond a reasonable doubt. In evaluating his claim, we view the evidence in the light most favorable to the prosecution and vacate the conviction only if no rational trier of fact could have found the elements of the crime beyond a reasonable doubt. See United States v. Swan, 224 F.3d 632, 636 (7th Cir. 2000).

This circuit's cases have defined intent to defraud as "acting willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." United States v. Moede, 48 F.3d 238, 241 (7th Cir. 1995), quoted in, e.g., United States v. Paneras, 222 F.3d 406, 410 (7th Cir. 2000). Davuluri argues that the evidence is uncontested that he always intended only to earn profits for Dr. Raju, rather than imposing any kind of loss on him. He also claims that he sought no benefit for himself, contending that Dr. Raju's testimony regarding the fifty-fifty split of profits is inherently unbelievable and that their only agreement was that Davuluri could obtain a temporary loan from the profits.

Davuluri's arguments are unavailing, since a rational jury could find beyond a reasonable doubt that he imposed a large risk of loss on Dr. Raju. Exposing the victim to a substantial risk of loss of which the victim is unaware can satisfy the intent requirement. See United States v. Catalfo, 64 F.3d 1070, 1077 (7th Cir. 1995); Moede, 48 F.3d at 242. That Davuluri sincerely intended his scheme to generate a profit is irrelevant. See United States v. Masquelier, 210 F.3d 756, 759 (7th Cir. 2000); United States v. Cosentino, 869 F.2d 301, 307 (7th Cir. 1989). The evidence shows that Davuluri told Dr. Raju that no more than $5,000 of the money in the account would ever be at risk, yet Davuluri's trading immediately put Dr. Raju at risk of losing over $21,000 and the total loss caused by Davuluri was over $785,000. Davuluri was a knowledgeable trader and the jury could have inferred that he knew the high levels of risk to which he was subjecting the account. On this basis, a reasonable jury could infer that Davuluri deceived Dr. Raju and exposed Dr. Raju to a much greater risk than what he had promised the cardiologist.

Davuluri also relies on United States v. Walters, 997 F.2d 1219 (7th Cir. 1993), but this argument is similarly unconvincing. The section of Walters on which Davuluri relies stands for the proposition that the government must prove that money or property was transferred from the victim to the defendant as part of a fraudulent scheme in order to convict under the mail or wire fraud statutes. Id. at 1227. In the instant case, a transfer occurred when Davuluri fraudulently obtained $50,000 of Dr. Raju's funds by promising him that this money would not be exposed to the level of risk that Davuluri's trading entailed; thus, Walters does not bar Davuluri's conviction.

A reasonable jury could have found that Davuluri subjected Dr. Raju to a substantial risk of potential loss. When combined with the voluminous evidence regarding Davuluri's deception and impersonation of Dr. Raju, a reasonable jury could have found beyond a reasonable doubt that Davuluri possessed the intent to defraud required to support a conviction under the mail and wire fraud statutes. Therefore, we affirm Davuluri's convictions on Counts I-IV.

B.  18 U.S.C. sec. 2314

In order to convict a defendant of an offense relating to a security under 18 U.S.C. sec. 2314, the government must prove that: (1) the defendant caused the security to be transported in interstate commerce; (2) the value of the security exceeded $5,000; (3) the security was taken by fraud; and (4) the defendant knew the security had been obtained by fraud. See United States v. Bond, 231 F.3d 1075, 1077 (7th Cir. 2000). Davuluri argues that he did not obtain the security by fraud and also claims that the security did not have a value of $5,000. These are challenges to the sufficiency of the evidence, and so we again view the evidence in the light most favorable to the government and reverse only if no reasonable jury could have found the elements beyond a reasonable doubt. See Swan, 224 F.3d at 636. Because we reject Davuluri's arguments, we affirm his Count V conviction.

1.  Obtained by fraud.

Davuluri claims that he did not take Dr. Raju's $400,000 check drawn on his account at Fidelity by fraud. Davuluri told Dr. Raju that the money was collateral that would never be touched. He claims that all of the witnesses agree that if the Yen had taken a sharp turn downward, this

statement would have been correct. Unfortunately for Davuluri, he did not include this qualification when he spoke to Dr. Raju. He told Dr. Raju only that the collateral would be completely safe; this kind of absolute statement indicates that the $400,000 would be returned to Dr. Raju regardless of any contingencies. This was, of course, incorrect, since the Yen continued to move upward and Dr. Raju's account was liquidated by Merrill Lynch, causing a loss of the $400,000 and more. A reasonable jury could have concluded that Davuluri knew that his unconditional statement to Dr. Raju was false because of the defendant's previous trading experiences and thus Davuluri obtained the $400,000 check by fraud.

2.  Value of the security.

Davuluri claims that Dr. Raju's check was worthless because of the absence of Dr. Raju's wife's signature. He cites United States v. Jackson, 576 F.2d 749, 755-56 (8th Cir. 1978) and United States v. Teresa, 420 F.2d 13, 17-18 (4th Cir. 1969) which hold that facially invalid securities cannot be the basis for a conviction under 18 U.S.C. sec. 2314. He also argues that the value of stolen items is measured by the price a willing buyer would pay and that the only relevant buyer here, Merrill Lynch, was not willing to pay anything for Dr. Raju's check. The government counters with cases from the Ninth Circuit, United States v. Taylor, 802 F.2d 1108, 1114 (9th Cir. 1986) and United States v. Urciuoli, 575 F.2d 768, 769 (9th Cir. 1978), which hold that an actually invalid instrument is still a security for purposes of 18 U.S.C. sec. 2314 as long as it appears to be valid, or could be made to appear valid with minor additions. The government claims that with the minor addition of Dr. Raju's wife's signature, the check would have appeared to be valid and thus is a security sufficient to support a conviction under 18 U.S.C. sec. 2314.

We need not decide into which line of cases Dr. Raju's check would fall because the evidence produced at the trial permits a different approach. 18 U.S.C. sec. 2311 defines the word "value" as used in 18 U.S.C. sec. 2314 and provides that value "means the face, par, or market value, whichever is the greatest." Dr. Raju testified that Fidelity had previously honored checks with only his signature and that others had accepted these checks as payment. From this evidence, a reasonable jury could conclude that the market value of the check was the amount for which it was written, since similar checks had been given that value by market participants.

Davuluri's argument that the check was worthless because Merrill Lynch refused to accept it fails because this circuit's case law establishes that the market value of fraudulently taken or stolen goods is the price "a willing buyer will pay," United States v. Brookins, 52 F.3d 615, 619 (7th Cir. 1995) (emphasis added), not what any particular idiosyncratic buyer will pay. For example, some businesses will not accept any checks but demand to be paid only in cash, but this hardly means that a check presented to and rejected by such a business becomes worthless. Likewise, the fact that Merrill Lynch's particular policies were apparently more stringent than most other market participants Dr. Raju dealt with does not mean that his check becomes valueless because Merrill Lynch rejected it.

## C.  Abuse of a Position of Trust

Davuluri's final argument is that the district court misinterpreted the statutory standard under U.S.S.G. sec. 3B1.3 in imposing a two level enhancement for abuse of a position of trust. In order for this increase to be appropriate, the government must show that (1) the defendant occupied a position of trust; and (2) the defendant's abuse of the position of trust significantly facilitated the commission of the offense. United States v. Bailey, 227 F.3d 792, 801 (7th Cir. 2000). Davuluri admits the facts regarding his trading on behalf of Dr. Raju, but claims that his activities are not a position of trust as that phrase is used in the Guidelines and thus the first prong of the enhancement test is not satisfied. We review the district court's interpretation of what constitutes a "position of trust" de novo. See Paneras, 222 F.3d at 412 (7th Cir. 2000).

Davuluri claims that under this circuit's case law the enhancement applies only where the defendant already occupied a formal position of trust, such as being a licensed broker, or where a close personal relationship exists between the defendant and his victim which gives rise to a position of trust. Davuluri argues that he did not occupy any other formal position of trust and that holding himself out as an experienced commodities trader is not considered to be a position of trust as a matter of law. He claims that he had only a standard commercial relationship with Dr. Raju, citing cases such as United States v. Dorsey, 27 F.3d 285, 289 (7th Cir. 1994). Thus, the first prong does not apply. Regarding the second prong, he contends that his conversations with Dr. Raju about their cultural heritage do not rise to the level of close

personal attachment but simply indicate an ordinary social relationship. For example, his discussions with Dr. Raju about his family in India were a much more distant connection than the romantic involvement in United States v. Strang, 80 F.3d 1214, 1220 (7th Cir. 1996). Davuluri relies heavily on United States v. Mullens, 65 F.3d 1560, 1566-67 (11th Cir. 1995), which reversed an abuse of a position of trust enhancement where the defendant developed relationships with his victims at a country club and had represented himself as a gifted investor, and also cites United States v. Koehn, 74 F.3d 199, 201-02 (10th Cir. 1996), which holds that sec. 3B1.3 applies only where an employee steals from his employer or the defendant is a fiduciary occupying or pretending to occupy a formal position of trust. The government responds that Davuluri held himself out as an experienced investor and exploited his shared cultural heritage to gain Dr. Raju's trust.

The district court properly applied the enhancement. First, a formal position of trust is not required for an increase under sec. 3B1.3. The sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant. See United States v. Stewart, 33 F.3d 764, 768 (7th Cir. 1994); United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993). Particularly relevant to this case and contrary to the defendant's argument, Davuluri can qualify for the enhancement on the basis of his trading on behalf of Dr. Raju even though the defendant was not a licensed broker. See Strang, 80 F.3d at 1219-20. To the extent that Koehn, 74 F.3d at 201-02, requires a formal position of trust for the sec. 3B1.3 enhancement to apply, it is in opposition to the law of this circuit and we respectfully decline to follow it.

Second, the discretion exercised by Davuluri shows that he occupies a position of trust. While the range of activities that may constitute a position of trust under our prior precedents is not entirely pellucid, we have frequently emphasized that a defendant who has wide discretion to act on behalf of his victim satisfies the first prong of the enhancement test. See United States v. Hernandez, 231 F.3d 1087, 1091 (7th Cir. 2000); United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000); United States v. Gellene, 182 F.3d 578, 596 (7th Cir. 1999); see generally U.S.S.G. sec. 3B1.3, Application Note 1 (A position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."). The evidence produced at trial

demonstrates that Davuluri was given complete discretion in using the money given to him by Dr. Raju to engage in commodities trading to earn a profit for the cardiologist. Dr. Raju apparently had little understanding of the investments and did not supervise Davuluri or otherwise have input regarding the trades. Dr. Raju's conferring of this unsupervised discretion to Davuluri in the belief that Davuluri would act for Dr. Raju's benefit shows that Davuluri did in fact occupy a position of trust. See, e.g., Gellene, 182 F.3d at 596. To the extent that Mullens, 65 F.3d 1566-67, holds that a financial advisor with total control over investors' funds does not occupy a position of trust, we respectfully decline to follow that decision as inconsistent with our own case law. Because the abuse of this position obviously aided Davuluri in committing the offense, the district court did not err in applying sec. 3B1.3./1

Davuluri contends that applying the enhancement to him would mean that sec. 3B1.3 automatically applies to all defendants convicted of fraud because the relationship between himself and Dr. Raju was purely commercial and all frauds imply a degree of trust. Davuluri's slippery slope argument fails because what distinguishes frauds based on commercial relationships where sec. 3B1.3 should apply to those where it should not is whether the defendant has broad discretion to act on behalf of the victim and the victim believes that the defendant will act in the victim's best interest. If not, then the enhancement should not be applied solely on the basis of a commercial arrangement (though the increase might still be appropriate for some other reason like a close personal relationship, see, e.g., Strang, 80 F.3d at 1220). For example, in Dorsey, the defendant and victim had only a lender-borrower relationship, 27 F.3d at 287, and there is no expectation in such an arrangement that the borrower is using his or her discretion to further the interests of the lender; thus, because no other kind of relationship existed between the parties, sec. 3B1.3 was inapplicable. However, as explained above, Davuluri wielded great discretion on behalf of Dr. Raju, making enhancement under sec. 3B1.3 appropriate in his case.

III.  Conclusion

Sufficient evidence was presented for a reasonable jury to conclude that Davuluri intended to defraud Dr. Raju, that he obtained Dr. Raju's check by fraud, and that the check had a value of more than $5,000. Davuluri's relationship with Dr. Raju involved a high degree of discretion that Davuluri should have exercised

to benefit Dr. Raju, and thus an enhancement for abuse of a position of trust is proper. Therefore, Davuluri's convictions and sentence are Affirmed.

/1 Given that the discretion that Dr. Raju conferred on Davuluri to act on the doctor's behalf justifies the abuse of a position of trust enhancement, we need not decide whether the exploitation of cultural ties or holding one's self out as an experienced trader standing alone could be the basis for such an increase.