In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1202

United States of America,

Plaintiff-Appellee,

v.

Linda Frykholm,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 00 CR 50001--Philip G. Reinhard, Judge.

Argued May 16, 2001--Decided September 25, 2001


   Before Harlington Wood, Jr., Coffey, and
Williams, Circuit Judges.

   Coffey, Circuit Judge.  On January 18,
2000, a grand jury indicted Linda
Frykholm for mail fraud, 18 U.S.C. sec.
1341, wire fraud, 18 U.S.C. sec. 1343,
and money laundering, 18 U.S.C. sec.
1957(a). The indictment alleged that
Frykholm conducted a scheme of fraud
under the name "J & L Investments" to
illegally deprive investors of more than
$10 million. The indictment further
alleged that certain properties,
including bank accounts, automobiles, and
property in the Lake Geneva, Illinois,
area were subject to forfeiture as
proceeds from Frykholm's scheme. On
August 31, 2000, Frykholm pleaded guilty
to wire fraud and money laundering and
admitted to the forfeiture allegations,
but reserved the right to challenge
various applications of the sentencing
guidelines. The court sentenced Frykholm
to a total term of imprisonment of 144
months, to be followed by three years
supervised release, and restitution in
the amount of $10,740,791. Frykholm
appeals her sentence, and we affirm.
I.  Factual Background

   Between April 1998 and January 2000,
Frykholm operated a fraudulent "Ponzi"
scheme/1 initially under the name "J &
L Investments" in Rockford, Illinois.

Although the details of Frykholm's promises to her "investors" varied, her misrepresentations contained a common thread: unrealistic profits to the investor in an extremely short period of time. For example, she promised some investors up to a 300% profit in as few as seven to ten days. Another investor was promised a 100% profit after only 72 hours of trading. Frykholm boasted the enormous returns would be generated by "off-shore" and "European" trading programs or even participation in United Nations' humanitarian projects in Honduras and Kosovo. Frykholm's schemes brought in almost $15 million from approximately 226 direct investors throughout the world in just under two years. Frykholm used some of the investment monies to pay purported profits and return of capital to earlier investors and converted the remainder to her own use./2 By paying the purported profits to the earlier investors, Frykholm was successful in enticing those investors to put in even more money and in convincing them in turn to contact other potential investors to solicit additional investments./3 In addition, Frykholm made efforts to keep her scheme secret by discouraging investors from reporting her fraudulent scheme. As part of the fraudulent enterprise, for example, she told investors that they had earned profits from non-existent trading programs and induced them to reinvest their profits in order that she would not have to account for the phantom profits. She further required investors to agree in writing not to discuss their investments in her scheme with other persons, including law enforcement.

Eventually Frykholm's pyramid scheme unraveled. In early 1999, investors began pressing Frykholm for their promised profits, and she initially stalled repayment with a number of excuses, suggesting to investors that their funds had been inadvertently routed to the wrong bank account, that wire transfers had been frozen, or even that "Y2K" computer problems/4 had caused the early termination of existing trading programs. Shortly thereafter investor Michael Cooper reported Frykholm to the Texas Securities Department after he became suspicious of Frykholm's numerous excuses in response to his requests for the return of his investment. The Texas

Securities Department thereafter referred Cooper's complaint to the Illinois Securities Department because Frykholm conducted the scheme within Illinois.

The Illinois Securities Department ("ISD") commenced an investigation into Frykholm's and J & L Investments' activities. The ISD served Frykholm with an administrative subpoena on February 5, 1999, commanding her to appear before the ISD on February 10, 1999 and to produce her J & L Investments records. At the hearing, Frykholm asserted her Fifth Amendment rights and refused to testify or produce any documents. Two days after the hearing, Frykholm opened a bank account under the name of Thatcher & Harrington, Ltd. in Wisconsin. Six days later, the ISD entered a Temporary Order of Prohibition against Frykholm and J & L Investments, prohibiting her from selling or offering securities in Illinois. After receiving the order of prohibition, Frykholm then opened bank accounts for herself and J & L Investments in Wisconsin.

As her Ponzi scheme continued to unravel, Frykholm made efforts to prolong it. On March 28, 1999, she decided to buy off Michael Cooper, the investor who had initially complained about her scheme. In order to buy off Cooper, Frykholm enlisted the aid of Max Akamai, who Frykholm had previously asked to help her in her business by meeting with investors, delivering checks to investors, and otherwise talking with those investors who had demanded the return of their investments. At Frykholm's direction, Akamai called Cooper and posed as an attorney, identifying himself only as "Robert." Akamai met Cooper to provide him with a cashier's check in the amount of $32,500. In hopes of further concealing her fraudulent scheme, Frykholm designed a written release, in which she threatened Cooper with federal mail and wire charges if legal action were brought on his behalf against Frykholm. Frykholm instructed Akamai to obtain Cooper's signature on the release before providing him with the $32,500.

After the expiration of the previously issued temporary order of prohibition, the ISD entered an order on May 28, 1999, barring Frykholm and J & L Investments

from further sales of securities within Illinois, but despite the order she continued her scheme. In November and December 1999, Frykholm began a last-ditch effort to buy her way out by paying back investors their initial investment and profits. She did so by sending out bad checks drawn upon a new account she established in the name of Newco Trust at the National City Bank in Belvidere, Illinois. When National City Bank became aware of her fraudulent plan, it closed her account. On January 7, 2000, Frykholm engaged in one final scheme to extricate herself from her legal and financial problems. Frykholm purchased round trip airline tickets to Zurich, Switzerland for herself and Max Akamai using the pseudonyms Melvin and Pamela Brown and attempted to flee the United States. When the airline would not let her use the tickets because they were not in her name, Frykholm purchased two additional tickets using a credit card she had established in her son's name. As she attempted to board the flight, FBI agents took her into custody and placed her under arrest.

Faced with a mountain of evidence against her, on August 31, 2000, Frykholm opted to plead guilty in the district court for the northern district of Illinois to one count of wire fraud, 18 U.S.C. sec. 1343 and one count of money laundering, 18 U.S.C. sec. 1957(b)(1) & (2) and admitted to the forfeiture allegations. The court accepted Frykholm's plea and set a date for sentencing. Before her sentencing hearing, Frykholm met with Probation Officer Teresa Brown, who completed the Presentence Investigation Report ("PSIR"). At the outset of the meeting, while Frykholm's counsel had momentarily left the room and before Brown had even begun questioning Frykholm, Frykholm told Brown that "[she did not] know what [she was] doing here" and that she had "never done anything wrong in [her] whole life." Relying upon this statement, Brown recommended that the district court decline to award Frykholm a reduction in offense level for acceptance of responsibility, U.S.S.G. sec. 3E1.1.

On January 11 and 12, 2001, the sentencing court held a hearing. At the hearing Frykholm testified extensively in hopes that the sentencing judge might

award her a downward adjustment for her acceptance of responsibility. Throughout the hearing Frykholm stubbornly denied having made the statement to Probation Officer Brown. Frykholm painted herself as extremely remorseful, as "more than sorry" and stated that she "pray[s] for these people [whom she defrauded] daily."

The district court did not believe that Frykholm was truly remorseful and declined to give her a reduction for acceptance of responsibility. The trial judge credited Probation Officer Brown's testimony concerning the statement previously referred to and found that Frykholm had indeed made the alleged statement. The court later commented on the implications of Frykholm's denial at the sentencing hearing:

I had the opportunity to hear the defendant testify, not only as to that [statement], but her complete testimony, and it is an inescapable conclusion that she would dodge any question that might implicate her any more. She was evasive when she needed to be evasive. For a person who is able to persuade so many investors to give up so much money, she has to be a pretty remarkable person in terms of her communication skills. I believe she made that statement to [the probation officer], and I believe she made it to somehow . . . convey, 'hey, I'm just sort of a person who's a pawn in this whole thing and to try to in some way attract some sympathy from the probation officer.'

I fully expected that she might come in and admit that she had made this statement, but that she made it in an emotional state, that she's been troubled over this, and she made it because . . . this whole thing has been an ordeal for her, and if such were the case, the court could understand the circumstances . . . . It's my belief that she made the statement, however brief, to attract some sympathy . . . to lend some persuasion to the probation officer that . . . she's not as bad a person as it seems.

And then to perpetuate it while she's on the witness stand by denying [she made the statement], I can't tolerate . . . . Therefore, I am denying her acceptance of responsibility for this offense.

The district court further found that Frykholm had abused a position of trust, U.S.S.G. sec. 3B1.3, and imposed a 2-level increase in offense level. Accordingly, the district court calculated Frykholm's adjusted offense level at 29.

The sentencing court next proceeded to calculate Frykholm's criminal history category. Based on information from the Illinois Department of Corrections ("IDOC") and the National Crime Information Center ("NCIC"), the probation officer recommended that the trial court add two points to her criminal history score because Frykholm was on parole when she conducted her Ponzi scheme, U.S.S.G. sec. 4A1.1(d). The probation officer noted that, according to information from the IDOC and NCIC, Frykholm was discharged from parole (for a 1994 Lake County, Illinois, deceptive practices, theft, and forgery conviction) on November 7, 1998, and therefore concluded that Frykholm was on parole when she commenced her Ponzi scheme in April 1998.

In response, Frykholm argued at the sentencing hearing that she had been released from parole in 1997, almost a year before she launched her Ponzi scheme. According to Frykholm, she was told in 1997 that she no longer had to report to her probation officer. Frykholm also submitted a rule to show cause petition requesting that she show why she should not be held in contempt for her failure to pay restitution as described in her 1994 conviction. The Lake County, Illinois assistant state's attorney who prepared the petition had written that Frykholm's parole was scheduled to end on June 23, 1997 (though he never explained the source of his information). The court chose to credit the information from the IDOC and NCIC, rather than the unsupported statement in the rule to show cause petition. With the two points the court imposed under sec. 4A1.1(d), the court calculated Frykholm's criminal history category as IV, which together with her adjusted offense level of 29, yielded a guideline-imposed sentencing range of 121 to 151 months. The district court sentenced Frykholm to a term of imprisonment of 144 months. Frykholm appeals her sentence.

## II. Issues

On appeal, Frykholm raises three issues. Frykholm contends that the district court erred when it denied her a downward adjustment in offense level for acceptance of responsibility. Secondly, Frykholm contends that the district court erred in imposing a sentencing enhancement because she abused a position of trust. Finally, Frykholm argues that the district court erred when it determined that she was on parole when she committed part of her scheme to defraud.

## III. Discussion

### 1. Acceptance of Responsibility

Frykholm contends that she was entitled to a three-level reduction in offense level for acceptance of responsibility, U.S.S.G. sec. 3E1.1 because she pleaded guilty, admitted her remorse during sentencing, and met with the government and Illinois Department of Securities investigators to help them trace the transactions and recover as much of the fraudulently obtained funds as remained. Section 3E1.1 provides for a decrease in offense level by 2 levels if the sentencing judge, in an exercise of discretion, determines that the defendant has clearly demonstrated acceptance ofresponsibility for her offense. In order to qualify for a downward departure for acceptance of responsibility, a defendant must: "1) demonstrate that [she] clearly recognizes and affirmatively accepts responsibility for [her] conduct; 2) timely notify authorities of [her] intention to enter a plea of guilty; and 3) truthfully admit the conduct comprising the offense of conviction and admit, or not falsely deny or frivolously contest, the relevant conduct as it relates to the offense of conviction." United States v. Mancillas, 183 F.3d 682, 711 (7th Cir. 1999).

"Whether a defendant has fully accepted responsibility for her offense is a finding of fact to be made by the trial court, and is based largely on the sentencing judge's determinations regarding the defendant's credibility and conduct bearing upon the question of whether the defendant has in fact accepted responsibility." United States

v. Schaefer, 107 F.3d 1280, 1289 (7th Cir. 1997). The sentencing judge is in a "unique position to evaluate a defendant's acceptance of responsibility . . . [and] because the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the 'clearly erroneous' standard will nearly always sustain the judgment of the district court in this area." United States v. Taylor, 72 F.3d 533, 549 (7th Cir. 1995).

Frykholm argues that the sentencing court erred in denying her an adjustment in offense level for acceptance of responsibility solely on the basis of her statement to the effect that "I have never done anything wrong." The gist of Frykholm's argument is that all of her other alleged acts of contrition (her timely guilty plea, cooperation with the government in tracing the funds she fraudulently obtained, and expression of sorrow and remorse at the sentencing hearing) more than outweigh any isolated statement where she denied any wrongdoing. Frykholm asserts that the statement could have simply been an expression of remorse, suggesting that she might have been meaning to express confusion as to how she had reached such a low point in her life. We disagree.

The district court did not deny her responsibility based solely upon the fact that she told the probation officer that she had never done anything wrong. The district court instead declined to give Frykholm the bargain-rate sentencing discount because she falsely denied during her sentencing hearing having made that statement to the probation officer. Contrary to Frykholm's argument, the district court expressly considered the possibility that Frykholm's statement might have been merely the product of stress and a poorly worded expression of confusion or remorse, stating that he "fully expected that [Frykholm] might come in and admit that she made this statement but that she made it in an emotional state . . . because . . . this whole thing has been an ordeal for her." The court went on to note that if such were the case, he was prepared to give Frykholm the sentencing reduction for acceptance of responsibility. When she denied having made the statement (rather than explain why she made it), the judge properly found that Frykholm had made the

statement in an attempt to manipulate the probation officer and evoke sympathy and next declined to give Frykholm an adjustment for acceptance of responsibility because she had compounded her error by lying about that statement while testifying during her sentencing hearing.

"The determination of whether a defendant warrants the reduction is context-specific." United States v. Branch, 195 F.3d 928, 937 (7th Cir. 1999). Unlike the district court, "we do not enjoy a 'front row seat' from which to assess [Frykholm's] statements and demeanor," and thus we are "ill-equipped to assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize [her] own punishment." Taylor, 72 F.3d at 552. In this case, where Frykholm was given an opportunity to explain a statement that seemed utterly inconsistent with acceptance of responsibility given its plain meaning, Frykholm not only chose not to explain the statement, but rather went beyond it and boldly attempted to offer an exculpatory denial. Cf. United States v. Corbin, 998 F.2d 1377, 1393 (7th Cir. 1993) (defendant who tried to deflect responsibility with exculpatory, but untrue, statements did not warrant acceptance of responsibility adjustment). The sentencing judge properly chose not to give any credence to her denial and instead determined that Frykholm had in fact advised the probation officer that she had never done anything wrong in an effort to evoke sympathy and to downplay her criminal conduct. Our review of the sentencing hearing reveals that the judge carefully considered and fully explained his reasoning in his decision to deny Frykholm an adjustment for acceptance of responsibility. We will not second-guess the sentencing judge's assessment of Frykholm's motivation because he "had the best opportunity to observe [Frykholm's] facial expressions, attitudes, tone of voice, eye contract, posture and body movements . . . ." Mancillas, 183 F.3d at 710 (citation omitted). Accordingly, we hold that the district court did not clearly err in declining to give Frykholm credit for accepting responsibility.

2. Abuse of Trust

Frykholm next argues that the trial

court erred in imposing a two-level enhancement for abuse of a position of trust, U.S.S.G. sec. 3B1.3. In order for the increase to be appropriate, the government must demonstrate that "(1) the defendant occupied a position of trust; and (2) the defendant's abuse of the position of trust significantly facilitated the commission of the offense." United States v. Davuluri, 239 F.3d 902, 908 (7th Cir. 2001). Frykholm claims that her activities did not place her in a position of trust as that phrase is used in the Guidelines and thus the first prong of the enhancement test is not satisfied. We review de novo the district court's interpretation of what constitutes a "position of trust." Id.

Frykholm claims that she did not occupy a position of trust because she did not hold a license to engage in commodities trading and because she kept the transactions at arms length and did not have a close personal relationship with any of her "investors." She maintains that had only a standard commercial relationship, looking to United States v. Brown, 47 F.3d 198 (7th Cir. 1995) for support. Frykholm argues that conducting a Ponzi scheme does not create a position of trust because her relationships (or lack thereof) with the "investors" provided her with the same opportunity that anyone else would have had.

Frykholm's argument falls far short of being convincing. We note initially that whether Frykholm was a licensed broker or not accomplishes nothing to answer the question as to whether she was in a position of trust. United States v. Strang, 80 F.3d 1214, 1219 (7th Cir. 1996). Instead, the "sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant." Davuluri, 239 F.3d at 908. In other words, whether Frykholm occupied a position of trust turns upon whether she had "access or authority over [other persons'] valuable things." Strang, 80 F.3d at 1220; Brown, 47 F.3d at 205.
While it may be true, as Frykholm contends, that she did not befriend her investors, it cannot be said that Frykholm did not hold herself out as experienced in investing. Frykholm told Rosalie Tabin that she had been investing

(and making money at it) for five years and that her father had been investing for thirty years. She promised investors wonderful and incredible returns on their investments to be generated by "European trading programs" or humanitarian investment projects run by the United Nations. She signed letters and contracts in which she "personally guaranteed" the funds "entrusted" to her would be used in "private investment[s]" or invitation only trading programs. In short, Frykholm acted as if she had experience in trading securities, that she would operate as a fiduciary for her investors, and that she would give them access to investment opportunities that they otherwise would not have had. Frykholm was given complete discretion in using the money given to her by her victims on the assumption that she would invest it in their best interests and as such occupied a position of trust. Davuluri, 239 F.3d at 909 (financial advisor with total control over investors' funds occupied position of trust despite lack of formal position of trust). Given Frykholm's complete discretion over her investor's funds and promises that she would invest for them, we hold that the district court did not err in concluding that Frykholm abused a position of trust.

3. Criminal History Category

Finally Frykholm argues that the district court erred in finding that she was on parole when she committed her offense and as a result erroneously added two points when calculating her criminal history category, U.S.S.G. sec. 4A1.1(d). We review the district court's factual finding that Frykholm was on parole when she committed her offense under the clearly erroneous standard. United States v. Newman, 148 F.3d 871, 876 (7th Cir. 1998); United States v. Edwards, 115 F.3d 1322, 1330 (7th Cir. 1997).

Frykholm argues that her parole ended in June 1997, almost a year before she commenced her Ponzi scheme. To support her argument Frykholm relies on the rule to show cause petition from a Lake County, Illinois assistant state's attorney stating her discharge date as June 23, 1997. Frykholm also points to a telephone conversation, which occurred around June 1997, with a parole officer in Rockford, Illinois, instructing her that she no longer had to report for

parole. Frykholm argues that the district court erred when it ignored the evidence she submitted and instead credited the evidence in the PSIR from the IDOC and NCIC stating that Frykholm's parole from her 1994 conviction terminated on November 7, 1998. Frykholm suggests that both sources of evidence were "equally reliable" and therefore the district court erred in selecting the November 7, 1998 date as her discharge from parole.

Frykholm's argument is without merit. "'Where there are two permissive views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" United States v. Stokes, 211 F.3d 1039, 1044 (7th Cir. 1999) (quoting United States v. Swanquist, 161 F.3d 1064, 1077 (7th Cir. 1998)). Moreover, we do not share Frykholm's assessment that her evidence was "equally reliable" with the information contained in the PSIR. Frykholm relied on a rule to show cause petition that was not concerned with the actual date Frykholm would be discharged from parole, but only that Frykholm was then on parole status. As the district court correctly noted, nowhere in the document did the petition explain the source of the Lake County state's attorney's information that Frykholm's parole was scheduled to end on June 23, 1997. The information contained in the PSIR, on the other hand, was provided by the IDOC (the institution that discharged Frykholm from her parole) and was verified by the NCIC. We hold that the sentencing judge's decision to credit the information from the IDOC and NCIC contained within the PSIR rather than the unsupported, informational statement in an assistant state's attorney's rule to show cause petition was not clearly erroneous.

IV.   Conclusion

We hold that Frykholm's arguments are without merit and further that the district court did not err in declining to award Frykholm a reduction in offense level for acceptance of responsibility or in imposing an upward adjustment in offense level for an abuse of a position of trust. We also hold that the district court did not err in calculating Frykholm's criminal history score when it added two points to her score because she was under a criminal justice sentence

when she commenced her Ponzi scheme.
Frykholm's sentence is AFFIRMED.

FOOTNOTES

/1 A Ponzi scheme involves individuals, like Fryk-
holm, who convince investors to purchase inter-
ests in phony or unprofitable investment schemes,
paying off old investors with the money obtained
from new investors. See United States v. Brown,
47 F.3d 198, 201 n.1 (7th Cir. 1995).

/2 Of the $14,928,905 Frykholm obtained from her
investors, she returned $4,575,570 as return on
investments as well as profits. With the money
she retained for herself, Frykholm, for example,
paid for her children's tuition to private
schools, gave money to relatives, purchased two
lake-front residences on Lake Geneva, purchased
cars and a boat, and funneled money into bank
accounts in her name throughout the world.

/3 Rosalie Tabin, Robert Walker, Digby Jarman,
Russell Pierce, and Malcolm Fox all solicited
other investors for Frykholm.

/4 Before the year 2000 there was much speculation
and fear that computer systems around the world
would develop errors or glitches in programs as
the calendar changed from 1999 to 2000.